**Roger S. BRAUGH et ux. Appellants,**

v.

**CORPUS CHRISTI BANK AND TRUST, Appellee.**

No. 1500.

Court of Civil Appeals of Texas, Corpus Christi.

Aug. 29, 1980.

Rehearing Denied Sept. 25, 1980.

**692**

Paul S. Francis, Ben H. Schleider, Jr., Schleider, Ewing & Francis, Houston, for appellants.

M. W. Meredith, Jr., William A. Abernethy, Meredith, Donnell & Edmonds, Corpus Christi, for appellee.

## OPINION

BISSETT, Justice.

In this appeal, the primary issue is whether the Texas usury law was preempted by federal legislation. Corpus Christi Bank & Trust (Bank) sued Roger S. Braugh and his wife, Kathleen M. Braugh (the Braughs), to recover the past-due principal sums remaining unpaid on several promissory notes covered by two loan agreements, accrued interest on the notes, attorney's fees; and to foreclose liens on various col-

lateral mortgaged by the Braughs pursuant to the terms of the instruments evidencing the loan transactions. The Braughs, in addition to a general answer, filed a cross-action wherein, among other claims, they asserted that the Bank had charged usurious interest rates. The cause was tried before a jury which answered special issues in favor of the Bank. The trial court, ruling that the Bank had not charged usurious interest, rendered a judgment which awarded the Bank the total sum of $861,984.35, and which granted judicial foreclosure of the liens. The Braughs have appealed. We affirm.

The Braughs resided on a ranch west of Rivera, Texas, where they conducted farming and ranching operations. On January 29, 1974, the Bank and the Braughs executed a loan agreement for the specified purposes of: 1) "consolidating existing indebtedness of [the Braughs]" and 2) "providing working capital for the farming and ranching operation." Contemporaneously, with the execution of the loan agreement, the Braughs executed a "consolidation note" in the principal sum of $986,000.00, payable to the Bank in five equal annual principal installments of $197,200.00 each, commencing December 1, 1974, with interest thereon until maturity at an annual rate of 10%, payable to the Bank in quarterly interest installments, which were due March 1, June 1, September 1, and December 1, of each year during the term of the note. This note consolidated the balances then due other lenders under preexisting notes.

In addition to the "consolidation note," the Braughs, in 1974, executed four "working capital notes" representing indebtedness for certain sums of money the Bank advanced to the Braughs in 1974. Under the terms of each of the said four notes, the respective principal sums were due on or before December 1, 1974, with interest accruing thereon at the rate of 10% per annum, payable at maturity.

During 1974, the Braughs paid the March, June, and September quarterly interest payments due on the "consolidation note."

Because of "poor economic conditions," the Braughs were unable to pay the principal and interest due on December 1, 1974, on the "working capital notes" and the last quarterly interest installment and annual principal payment due on the "consolidation note." The loan officer of the Bank in charge of the Braugh loan, discussed the situation with the Braughs and, on behalf of the Bank, agreed to "renew and extend" the amounts due on the notes until March 3, 1975, provided that, on or before December 31, 1974, the Braughs paid the past–due interest on each note for the period ending December 1, 1974. Thereafter, on December 31, 1974, the Braughs paid a total of $76,233.03, representing interest payments due on the notes for the period ending December 1, 1974. The "renewal and extension" agreements were then accomplished by stamping on the back of each note a printed legend containing blanks for the appropriate extension time and interest rate which were completed to show that the maturity date for each past due principal payment had been extended to March 3, 1975, at an interest rate of 12.5% per annum during the 90–day extension period (December 2, 1974 to March 3, 1975) instead of 10% per annum as provided in the original notes. The "renewal and extension" forms were signed by the Braughs and initialed by a Bank official.

After the Braughs were unable to pay the quarterly interest installment on the "consolidation note" due on March 1, 1975, and the principal payments on the "consolidated note" and the "working capital" notes due March 3, 1975, pursuant to the "extensions and renewals" of such notes, the Bank made a final advance to the Braughs under the first loan agreement. This advance was evidenced by a promissory note executed by the Braughs on March 4, 1975, in the principal amount of $88,812.68, payable to the Bank "on demand" with interest thereon at a rate of 10% per annum. A portion of this advance was used to pay the interest due on each note during the 90–day extension period ending March 3, 1975.

On April 9, 1975, the Braughs paid to the Bank a sum of $501,635.00, representing proceeds they received from a cattle sale. From this payment, the Bank credited the sum of $197,200.00 to the principal payment due (March 3, 1975) on the "consolidation note," and the sum of $17,471.76 to interest due on the "consolidation note," the four "working capital" notes, and the March 4, 1975 note. The Bank used the remainder of the payment to cover overdrafts in the Braughs' checking account and to pay insurance premiums due on certain policies maintained by the Braughs to insure the collateral securing remaining total indebtedness. At this time, the four "working capital" notes and the March 4, 1975, note were "renewed and extended" in the same manner until October 8, 1975. The notes, as renewed and extended, bore interest at the rate of 10% per annum.

The Braughs failed to timely pay the quarterly interest payment which was due on June 1, 1975, pursuant to the terms of the "consolidation note." Subsequently, various meetings were held and numerous letters were written by the Bank to the Braughs concerning their loan account. Following certain negotiations, a second loan agreement was executed on January 8, 1976, whereby the Braughs agreed to consolidate their outstanding indebtedness on the prior notes by executing a single note in the principal sum of $1,612,612.68, (the second "consolidation note"), payable on or before August 15, 1976, with interest thereon at the rate of 10% per annum. The Bank agreed to accept such note "in renewal and extension of the principal balance owing . . . ." The agreement waived all prior defaults. In addition, it contained the following provision concerning the outstanding past–due interest:

> "The payment of the accrued interest owing on the indebtedness as of the date hereof shall be deferred until the proceeds from the sales described in [the following specified paragraph] are delivered to Bank or if Bank determines there are insufficient net proceeds from such sales to pay said interest in full, until February 15, 1976. The amount of said interest as of date hereof is *$136,078.00.*"

The unpaid interest ($136,078.00) on such indebtedness was handwritten into a blank space left in the agreement for that purpose. Thereafter, on January 26, 1976, the Braughs executed two separate notes representing additional advances made by the Bank to the Braughs on that date, one for the principal sum of $60,815.67, and the other, for the principal sum of $11,000.00 Each of these notes was payable to the Bank on or before August 15, 1976, with interest on the balance at the rate of 10% per annum until maturity. All of the hereinbefore described notes bore interest on all past–due principal and interest at the rate of 10% per annum.

After a sequence of events, the Bank, by a letter dated February 20, 1976, sent notice of acceleration of all notes to the Braughs. On March 17, 1976, the Bank filed its original petition seeking the appointment of a receiver. Thereafter, the Bank received other payments which were credited to the outstanding principal balance due on the "consolidation note." The Bank, in its amended trial petition, which was filed on June 30, 1978, alleged that, after allowing all offsets and credits, the Braughs owed the principal amount of $566,954.12 pursuant to the terms of all prior notes covered by the second "consolidation note" and the entire principal amount of $60,815.67 and $11,000.00 on the notes dated January 26, 1976, plus accrued interest and reasonable attorney's fees according to the terms of each of the notes.

In summary, the Braughs' primary counterclaim was predicated, in part, upon the contention that, by charging them interest at the rate of 12.5% per annum during the period from December 2, 1974, to March 3, 1975, the Bank had violated the Texas usury laws because it charged and collected interest which exceeded the permissible rate in Texas of 10% per annum. They also alleged that the interest charge of $136,078.00 as past–due interest for the period ending January 8, 1976, contained in the second loan agreement, was usurious because it exceeded the lawful rate of interest of 10% per annum on the unpaid principal balance for the period ending January 8,

1976. They asked that all interest payments should be credited to the outstanding unpaid principal sums, and prayed for the recovery of statutory penalties equal to twice the amount of interest charged, plus attorney's fees. In their counterclaims, they also alleged wrongful and fraudulent conduct by the Bank, breaches of the second loan agreement, and wrongful acceleration of the outstanding indebtedness, for which a recovery in money damages was sought.

The Bank, in defense of the claims asserted by the Braughs, alleged, in substance, that Public Law 93–501, as enacted by Congress on October 24, 1974, preempted state usury laws and authorized the Bank to charge the Braughs interest accruing at the rate of 12.5% per annum on the notes for the ninety–day extension period from December 2, 1974, to March 3, 1975. It defended against the Braughs' second usury charge on the ground of accidental or bona fide error. It also denied that it committed any fraudulent misconduct or wrongfully accelerated the payment of any note.

After a lengthy jury trial, a charge containing 36 special issues was submitted to the jury. In summary, the jury, answered special issues favorably to the Bank and adversely to the Braughs on their counterclaims. In relevant part, the jury found: 1) as of July 10, 1978, the Braughs owed the amount of $765,732.10 on the notes to the Bank; 2) the inclusion of the sum of $136,078.00 in the second loan agreement and in the Bank's initial petition was the result of an accidental and bona fide error; and 3) the Braughs agreed to the 12.5% interest charge. Pursuant to an agreement of the parties, the question of whether the 12.5% interest charge constituted usury was submitted to the trial judge for his determination as a matter of law. Thereafter, judgment was rendered awarding the Bank the sum of $861,984.35, plus post–judgment interest and judicial foreclosure of the liens upon the collateral securing the outstanding indebtednesses.

Although the Braughs present nine points of error for our consideration, the crux of

their appellate contentions is contained in points of error one and two, which complain, in essence, that the trial court erred by refusing to hold that the Bank violated the Texas usury laws, as a matter of law, by charging interest at the rate of 12.5% per annum for a ninety–day period to "renew and extend" five of the notes in question. At issue is whether Public Law 93–501, §§ 202, 206, 88 Stat. 1557 (1974), enacted by the United States Congress on October 29, 1974, applies to the parties' agreements to "renew and extend" loans evidenced by notes which were executed before October 29, 1974, when such "renewal and extension" agreements were executed after October 29, 1974, the effective date of the federal legislation.

Title II of Public Law 93–501, known as, and hereafter referred to as, the "Brock Bill," amended the National Bank Act, the Federal Deposit Insurance Act, and the National Housing Act to permit national banks, FDIC–insured state banks and FSLIC–insured savings and loan associations to charge interest on business and agricultural loans in the amount of $25,000 or more, at a rate of not more than 5 percent in excess of the discount rate on ninety–day commercial paper in effect at the Federal Reserve district where the institution is located, notwithstanding any State Constitution or statute to the contrary.

Section 202 of the Brock Bill, which amended 12 U.S.C. § 1831a(a), reads:

"In order to *prevent discrimination against* State–chartered insured banks with respect to interest rates, if the applicable rate prescribed in this subsection exceeds the rate such State bank would be permitted to charge in the absence of this subsection, *a State bank may in the case of business or agricultural loans in the amount of $25,000 or more, notwithstanding any State constitution or statute, which is hereby preempted for the purposes of this section, take, receive, reserve, and charge on any loan or discount made, or upon any note, bill or exchange, or other evidence of debt,* interest at a rate of not more than 5 per centum in excess of the discount rate on ninety–day commercial paper in effect at the Federal Reserve bank in the Federal Reserve district where the bank is located, and such interest may be taken in advance, reckoning the days for which the note, bill, or other evidence of debt has to run." (emphasis added.)

Section 206 of the Brock Bill, which governs the effective date of the limited federal preemption of state interest rates, provides as follows:

"The amendments made by this title shall apply to *any loan made* in any State *after* the date of enactment of this title [October 29, 1974], but prior to the earlier of July 1, 1977, or the date (after the date of enactment of this title) on which the State enacts a provision of law which prohibits the charging of interest at the rates provided in the amendments made by this title." (emphasis added.)

In this case, it is undisputed that: 1) the Bank is a federally insured state bank within the meaning of Public Law 93–501; 2) the original loans to the Braughs evidenced by the notes were in excess of $25,000 and were made for agricultural or business purposes; 3) the notes in question were executed prior to October 24, 1974; 4) the Bank had advanced the principal amount of each loan prior to October 24, 1974; 5) the Bank advanced no additional amounts of money with the "renewal and extension" of the original loans; 6) the Bank relied upon Public Law 93–501 to charge interest at the rate of 12.5% per annum for a ninety–day period in accordance with the "renewal and extension" of the loans in question; 7) the Federal Reserve discount rate during the time in question permitted the Bank to charge a maximum interest rate of not more than 12.75% per annum on loans within the purview of the Brock Bill; and 8) the interest rate of 12.5% per annum charged by the Bank to "renew and extend" the notes in question exceeded the maximum interest rate of ten percent (10%) then permissible in Texas.

The Braughs contend that the Brock Bill did not preempt Texas law on usury because such Bill, by its express terms, and supported by its legislative history, applies only to loans made *after* October 29, 1974, and not to renewals or extensions entered into after that date which pertain to loans originally made prior to October 29, 1974. The Bank, on the other hand, contends that the Bill did preempt Texas law and that the express language and legislative history of the Bill shows that a limitation of the Bill's applicability to *new* loans, as asserted by the Braughs, would defeat the clear purpose and intent of the Bill, which is to include within its purview "renewals and extensions" on existing business and agricultural customer loans when they became due.

The cardinal rule of statutory interpretation is to ascertain and effectuate the legislative intent. *Flora v. United States*, 357 U.S. 66, 78 S.Ct. 1079, 2 L.Ed. 1165 (1958); *Misiton v. Frank*, 545 S.W.2d 442 (Tex.Sup. 1976); *Jessen Associates, Inc. v. Bullock*, 531 S.W.2d 593 (Tex.Sup.1975). The wording of the statute and the legislative history evidence congressional intent in enacting federal legislation. *Solomon v. United States*, 559 F.2d 309, 310 (5th Cir. 1977); see e. g. *Helvering v. Hutchings*, 312 U.S. 543, 61 S.Ct. 651, 85 L.Ed. 909 (1941); *United States v. American Trucking Associations*, 310 U.S. 534, 60 S.Ct. 1059, 84 L.Ed. 1345 (1939). Our first reference is to the literal meaning of the words employed. Generally, the plain, unambiguous meaning derived from the words of a statute is to be accorded to them if to do so is consistent with the purpose of the law. *Flora v. United States*, 357 U.S. 66, 78 S.Ct. 1079, 1081, 2 L.Ed. 1165 (1958); *Caruth v. United States*, 566 F.2d 901, 905 (5th Cir. 1978). See *Donnell v. United States*, 229 F.2d 560, 562 (5th Cir. 1956).

Limiting our review initially to the express language of the statute in question, we observe that the Brock Bill applies only to an agricultural or business loan in excess of $25,000 which is made after October 24, 1974, (and prior to the Bill's expiration date), by specified state lending institutions. The general language contained in the above–quoted Section of the Bill permits the Bank to charge the interest rate mentioned therein upon "any note, bill or exchange, *or other evidence of debt*," made after its effective date. (Emphasis added).

■ It cannot be doubted that the "renewals and extensions" in question clearly are "evidence of a debt" within the meaning of this section.[1] In Texas, the execution of "an extension" agreement pertaining to an outstanding debt or the execution of a (new) "renewal" note is generally treated as a new contract, evidencing the existing debt. See *Schwab v. Schlumberger Well Surveying Corp.*, 198 S.W.2d 79 (Tex. Sup.1946); *Bank of Austin v. Barnett*, 549 S.W.2d 428, 430 (Tex.Civ.App.–Austin 1977, no writ); *Smith v. First Pasadena State Bank*, 401 S.W.2d 123, 127 (Tex.Civ.App.– Houston 1966, no writ). See *Texas National Bank of Beaumont v. Debes*, 120 S.W.2d 794 (Tex.Sup.1938).

■ It is a universal rule that a remedial or curative statute should be given the most comprehensive and liberal construction as possible in order to accomplish the legislative purpose. *Burch v. City of San Antonio*, 518 S.W.2d 540 (Tex.Sup.1975). Such a statute should be construed in a manner to give effect to the purpose of the legislature and not to defeat, nullify or thwart it. *State of Texas v. Estate of Loomis*, 553

---

1. An extension agreement generally provides for a further extension in the length of time for performance of an agreement. Black's Law Dictionary, p. 523 (5th Ed. 1979). As commonly used in the commercial law area, the term "extension" imparts "[a]n allowance of additional time for the payment of debts. An agreement between a debtor and his creditors by which they allow him further time for the payment of his liabilities. A creditor's indul-

gence by giving a debtor further time to pay an existing debt." Black's Law Dictionary, p. 523 (5th Ed. 1979). A "renewal" as that term is commonly used with reference to notes imparts a postponement of the maturity of an obligation. An obligation is "renewed" when the same obligation is carried forward by the new paper or undertaking. Black's Law Dictionary, p. 523 (5th Ed. 1979).

S.W.2d 166 (Tex.Civ.App.–Tyler 1977, writ ref'd). A literal construction should not be adopted if such construction is dependent on an artificial meaning of the words of the statute, or would lead to an absurd, unjust or unintended result, or is out of harmony with the statutory scheme. *Helvering v. Hutchings*, 312 U.S. 393, 61 S.Ct. 653, 85 L.Ed. 909 (1941); *Holy Trinity Church v. United States, 143 U.S. 457, 12 S.Ct. 511, 36 L.Ed.2d 226 (1892); United States v. Mendoza*, 565 F.2d 1285 (5th Cir. 1978).

The legislative history of the Brock Bill [2] reflects congressional concern with the outflow of available money from the states with low interest ceilings on commercial debts, and reveals that the Bill was enacted because of an unexpected, severe financial crisis. The Bill was passed as an interim, curative, remedial, and emergency measure designed to give banks access to funds desperately needed by business and agricultural borrowers, and to alleviate the disastrous economic consequences experienced by such commercial borrowers and banks alike doing business in states maintaining unrealistic statutory interest rate maximums in spite of the economic realities of the money market.

The Senate Committee summarized its findings concerning the necessity of the legislation as follows:

"In sum, the evidence before the Committee indicates that loans in the affected states are becoming unavailable, liquidity of financial institutions is adversely affected, small borrowers are disadvantaged with competing with national corporations and there is an outflow of funds from the states. Unless remedial action is taken in the very near future, these states could suffer from unemployment and business failures. Since it will take a considerable length of time to amend the constitution in at least one of the states to provide a complete remedy, the Committee has acted favorably upon this Title to meet the emergency by providing an interim solution." See footnote 2.

The legislative history, when considered in its entirety, shows that the congressional intent which prompted the passage of the Brock Bill, was *not* to disturb preexisting loans or contractual relationships pursuant to the terms of a preexisting agreement. It does not, however, evidence an intent to *preclude* a voluntary modification of a preexisting loan which is, in fact, in default after the inception date of the Bill, particularly where, as here, the Bank was entitled to declare a default and to foreclose the liens securing the notes. Where a "renewal" or "extension" is executed under such circumstances, the old contractual relationship is modified by new terms and provisions. *Benson v. Phipps*, 87 Tex. 578, 29 S.W. 1061 (1895); *Maceo v. Doeg*, 558 S.W.2d 117 (Tex.Civ.App.–Austin 1977, writ ref'd n.r.e.). Certainly, the fact that the Braughs and the Bank entered into another contractual relationship wherein the Bank "loaned" the Braughs more time within which to pay their past due indebtedness did not disturb their prior contractual relationship, which already had been disturbed by the Braughs' default. Moreover, the "renewals and extensions" here involved constitute a "new consideration" between the parties, and "other evidence of debt" within the literal meaning and purview of the Bill.

Furthermore, the overly technical construction advanced by the Braughs would lead to an absurd result by requiring the Bank, if the preexisting loan is to be extended at a rate of interest in excess of 10% per annum, to "technically" discharge the preexisting indebtedness, and then to make a *new* loan evidenced by a *new* loan agreement involving moneys which are merely juggled in an intra–paper transfer. To require such a technical discharge of the original obligation as a prerequisite to invoking the provisions of the Brock Bill is a restrictive requirement which is not warranted by

2. Senate Report No. 93–1120, 93rd Cong., 2d Session, reprinted [1974] in U.S. Code Cong. & Admin.News, pp. 6249, 6259–66.

either the Bill's express language or by congressional intent as revealed by its legislative history. In addition, if we were to construe the Bill in the manner advocated by the Braughs, we would thwart the very purposes for which Congress enacted such emergency and remedial legislation. Only for customers seeking a new loan would a bank be able to grant loans at the higher rate. Customers having existing loans due after October 29, 1974, would have to pay them in full or risk foreclosure, because a lending institution could not afford to continue the loan through an "extension" or "renewal" at the same interest rate provided in the preexisting note. This would result in severe economic hardships for the bank and customers alike during periods of fast–rising interest costs.

Although this case is, apparently, a case of first impression in Texas, the courts of Georgia have rejected the identical contentions made by the Braughs in the instant case. In *Kennedy v. Brand Banking Co.*, 152 Ga.App. 47, 262 S.E.2d 177 (1979), aff'd in part & rev'd in part on other grounds, 245 Ga. 496, 266 S.E.2d 154 (1980), the intermediate appellate court considered the application of the "Brock Bill" to a series of renewal notes, executed after the effective date of the Bill, which renewed a business debt evidenced by a note originally executed prior to the effective date of the Bill. There, the borrower argued that the "Brock Bill" did not preempt the Georgia usury statutes because the initial loan was made prior to its effective date. The Court of Appeals disagreed, and, 262 S.E.2d at page 180 of the published opinion, stated:

> "Appellant argues that the legislative intent (of the Bill) as revealed in 1974 U.S. Code Congressional and Administrative News, p. 6249, shows that this law was not meant to apply to loans made prior to its effective date. While we agree with *this contention, we do not* believe that a renewal note executed for a new consideration would violate the intent of Congress; 12 U.S.C.A. § 1831a(a) expressly provides that it applies to '... any loan or discount made, or upon any note, bill or exchange, *or other evidence of debt*

... ' made after October 29, 1974." (Emphasis supplied).

We are of the opinion, and so hold, that under the facts and circumstances here presented and the law applicable thereto, the trial court correctly held that the 12.5% interest charged by the Bank for the period of time in question was not usurious. In the instant case, the Texas law was preempted by the Bill. Points one and two are overruled.

In points of error three, four and five, the Braughs attack the jury's findings that the $136,078.00 interest charge was the result of an accidental and bona fide error because these findings are not supported by legally or factually sufficient evidence. We have reviewed the evidence in accordance with the well known standards governing our review of legal and factual sufficiency points of error, and find that there is ample evidence to support the jury's answers to these special issues in question and that such answers are not against the great weight and preponderance of the evidence. See Calvert, "No Evidence" and "Insufficient Evidence" Points of Error, 38 Tex.L. Rev. 359 (1960). Points of error three, four and five are overruled.

We have also carefully considered each of appellants' remaining points of error and find them to be without merit. Accordingly, points of error six through nine are overruled.

The judgment of the trial court is AFFIRMED.