736 S.W.2d 894 (1987)
CITY OF CORPUS CHRISTI, Texas, Appellant,
v.
ACME MECHANICAL CONTRACTORS, INC., Appellee.
CITY OF CORPUS CHRISTI, Texas, Appellant,
v.
AMBER ELECTRIC CO., INC., Appellee.
Nos. 13-86-417-CV, 13-86-418-CV.
Court of Appeals of Texas, Corpus Christi.
August 28, 1987.
Rehearing Denied September 24, 1987.
*896 Carol Estes Bray, Asst. City Atty., Legal Dept., Corpus Christi, for appellant.
Fisher Alsup, Alsup & Alsup, Corpus Christi, for Acme.
Paul Dodson, White, Huseman, Pletcher & Powers, Clyde Jackson, Corpus Christi, for Amber.
Before NYE, C.J., and UTTER and SEERDEN, JJ.

OPINION
NYE, Chief Justice.
Appellees, Amber Electric Company (Amber) and Acme Mechanical Contractors, Incorporated (Acme), brought separate suits as subcontractors against appellant, City of Corpus Christi (City) as owner; La Man Construction (La Man) as prime contractor; and Royal Indemnity Company as surety on La Man's payment bond, in connection with the construction of a public building.[1] The pleadings and judgment in both suits were virtually the same. Because the issues, briefs and evidence in both cases are similar, we have consolidated the cases for disposition.
These suits arose out of a construction contract between La Man and the City for the improvement and expansion of the Meadow Park Recreation Center, owned by the City. During the pendency of the suits below, La Man, the contractor, filed for bankruptcy relief and was dismissed from the suits. Apparently, Royal Indemnity Co. was a fictitious company and was never served with notice of the suits, so is not a party in this appeal in either case. Recovery was had in each suit against the City alone. The cases were consolidated for a trial before the court. The judgments merely recite that Amber and Acme are entitled to recover certain amounts from the City. The findings of fact and conclusion of law filed by the trial court are so vague it is difficult for us to determine which theory or theories the trial court found would be the basis upon which appellee could recover.
In each case, the subcontractors sought recovery from the City owner for nonpayment of services and materials furnished in the construction of a public facility. In effect, these cases were tried on three theories: (1) quantum meruit; (2) a governmental taking without compensation in violation of Article I, § 17, of the Texas Constitution; and (3) the City's breach of a statutory duty imposed by Tex.Rev.Civ.Stat. Ann. art. 5160 (Vernon 1987), by negligently approving a bogus payment bond which left the subcontractors with no statutory remedy. The City now challenges appellees' recoveries on each theory. After reviewing all of the evidence and the law, we find that we must reverse each case and remand each of them for a new trial.
In 1983, the City advertised for construction bids for the expansion and improvement of the Meadow Park Recreation Center. The plans and specifications were designed by the architect and approved by the City. Section A of the specifications consisted of a "Notice to Bidders" which stated in part:
The City requires that the successful bidder furnish a satisfactory payment and performance bond in the amount of 100% of the total contract price, both duly executed by such bidder as principal and by a corporate surety duly authorized so to act under the laws of the State of Texas as surety (emphasis ours).
The specifications provided a payment bond form to be used by the successful bidder.
*897 Acme and Amber saw the advertisement, obtained copies of the plans and specifications, and submitted bids to several of the prime contractors bidding the project, including La Man. La Man was low bidder and was awarded the contract by the City. La Man submitted a purported payment bond in the amount of the total contract price of $267,748.00. The payment bond was approved by the City. Amber entered into a subcontract with La Man for the electrical work on the project in the amount of $15,500.00. Acme entered into a subcontract with La Man for the air conditioning and plumbing work on the project in the amount of $46,103.00. In late November or early December 1983, after both subcontractors had expended substantial amounts of labor and material, La Man abandoned the project owing each subcontractor some money. The City subsequently discovered La Man's payment bond was fraudulent and worthless.
A subcontractor on a public building is prohibited from asserting a mechanic's lien which is normally the remedy available to him on private construction projects. Instead, Tex.Rev.Civ.Stat.Ann. art. 5160 provides in relevant part:
A. Any ... firm, or corporation, hereinafter referred to as "prime contractor," entering into a formal contract in excess of $25,000 with ... any municipality of this State, ... or any municipality of this state ... shall be required before commencing such work to execute to the aforementioned governmental authority .. the statutory bonds as hereinafter prescribed ... Each such bond shall be executed by a corporate surety or corporate sureties duly authorized to do business in this State ... [T]he bonds shall be payable to the governmental awarding authority concerned, and shall be approved by it as to form. Any bond furnished by any prime contractor in an attempted compliance with this Act shall be treated and construed as in conformity with the requirements of this Act as to rights created, limitations thereon, and remedies provided.
(b) A Payment Bond, in the amount of the contract, solely for the protection of all claimants supplying labor and material ... in the prosecution of the work provided for in said contract, for the use of each such claimant.
B. Every claimant who has furnished labor or material in the prosecution of work provided for in such contract in which a Payment Bond is furnished as required thereinabove, and who has not been paid in full thereof, shall have the right, if his claim remains unpaid after the expiration of sixty (60) days after the filing of the claim as herein required, to sue the principal and the surety or sureties on the Payment Bond jointly or severally for the amount due on the balance thereof unpaid at the time of filing the claim or of the institution of the suit plus reasonable attorneys' fees. . . .

QUANTUM MERUIT
In its first three points of error in both cases, the City asserts that the trial court erred in rendering judgment against the City on quantum meruit. The City complains that the trial court failed to make a finding of fact on at least one of the essential elements of quantum merit, and that there is no evidence or insufficient evidence to support an implied finding in that regard.
The trial court's findings of fact and conclusion of law which relate to Amber's recovery on quantum meruit are as follows:
[Findings of Fact:]
3. The City of Corpus Christi, Texas advertised for bids on a project known as Meadow Park Recreation Center.
4. The City ... was the owner of the Meadow Park Recreation Center at all times material to this cause.

* * * * * *
9. There was a balance due and owing to [Amber] in the amount of $13,351.71.

* * * * * *
*898 13. That the electrical labor and materials supplied by [Amber] were for [the] benefit and use of the [City] as used and placed in the Meadow Park Recreation Center.
13. [sic] [Amber] has not been paid for labor and materials in the amount of $13,351.71.
14. All work and materials furnished were reasonable and necessary to the use and enjoyment of [the] Meadow Park Recreation Center by the [City].

* * * * * *
18. [Amber] relied upon the [City] to secure a valid performance bond as required by law.
[Conclusion of Law:] 1. The [City] owes [Amber] $13,351.71.
The findings and conclusion as to Acme are almost identical to Amber's, except that the trial court found that Acme had furnished material and labor in the amount of $36,717.00 for which it had not been compensated.
There is no question in this case that the contracts between each of the subcontractors and La Man were separate and independent from the contract between La Man and the City. In its contract with the City, La Man agreed to supply "such materials, services, labor and insurance as required by the attached contract documents, including overseeing the entire job."
In order for a subcontractor to recover on his contract against a property owner, he must establish that he was in privity of contract with the property owner. Miles v. Plumbing Services of Houston, Inc., 668 S.W.2d 509, 511 (Tex.App.Houston [14th Dist.] 1984, writ ref'd n.r.e.); Sugarland Business Center Ltd. v. Norman, 624 S.W.2d 639, 641 (Tex.App. Houston [14th Dist.] 1981, no writ). As a general rule, in the absence of an express contract making the owner liable, the compensation of persons who perform labor for or furnish material to a prime contractor is to be paid by the prime contractor and not by the owner, although the work is done under the direction of and in accordance with the plans furnished by the owner. The subcontractor or materialman must look to the prime contractor for payment, because, in the absence of an express contract, there is no privity between the subcontractor, employed by the prime contractor, and the owner. The liability of the owner is only to the prime contractor, who is liable to the subcontractor. Calvin v. Koltermann, Inc., 563 S.W.2d 950, 955 n. 1 (Tex.Civ.App.San Antonio 1977, writ ref'd n.r.e.); Carruth v. Valley Ready-Mix Concrete Co., 221 S.W.2d 584, 592 (Tex. Civ.App.Eastland 1949, writ ref'd).
Since there was no privity, Amber and Acme could only recover from the City the reasonable value of their materials and services in a quantum meruit action. Quantum meruit is an action independent of a contract, and is based on an implied agreement to pay for benefits accepted and received. Berger Engineering Co. v. Village Casuals, Inc., 576 S.W.2d 649, 652 (Tex.Civ.App.Beaumont 1978, no writ).
The necessary elements for recovery under quantum meruit are that: 1) valuable services or materials were furnished; 2) for the person sought to be charged; 3) these services and materials were accepted, used and enjoyed by the person sought to be charged; 4) under such circumstances as reasonably notified the person sought to be charged that the plaintiff, in performing such services, was expecting to be paid by the person sought to be charged. City of Ingleside v. Stewart, 554 S.W.2d 939, 943 (Tex.Civ.App.Corpus Christi 1977, writ ref'd n.r.e.); see also Berger Engineering, 576 S.W.2d at 652; Crockett v. Brady, 455 S.W.2d 807, 808 (Tex.Civ.App.Austin 1970, no writ); Crockett v. Sampson, 439 S.W.2d 355, 358 (Tex.Civ.App.Austin 1969, no writ).
There is no question that the facts of each case satisfy the first three elements of an action for quantum meruit. The issue is whether the record in each case reflects that each subcontractor rendered *899 services and materials under such circumstances as to reasonably notify the City that each subcontractor expected to be paid by the City.
Amber and Acme seem to argue that the trial court's fact findings, that each subcontractor relied on the City to require a valid payment bond, somehow satisfies this fourth element of an action for quantum meruit. If anything, this fact only supports the City's position that, in furnishing the services and materials, the subcontractors actually looked to La Man and its bonding company for payment, and only looked to the City after it became apparent that they could not collect from either. Whether the City is subject to any liability for its role in approving the fraudulent bond relates to a separate cause of action, which we will consider later, and not to the quantum meruit action.
The subcontractors point to two cases which they claim support their positions: Prairie Valley Independent School District v. Sawyer, 665 S.W.2d 606 (Tex.App. Fort Worth 1984, writ ref'd n.r.e.), City of Ingleside, 554 S.W.2d 939.
The City of Ingleside involved a suit by a subcontractor against a municipality on quantum meruit. In that case, the City contracted with a general contractor, Smith, to construct a public building. Smith, in turn, contracted with the subcontractor for the air conditioning work on the building. Despite Article 5160, the City did not require Smith to post a payment bond. The City became dissatisfied with Smith's performance on the job and eventually took over the supervision of the job. The air conditioning subcontractor was not paid for his work and sued the City, not Smith. His recovery under quantum meruit was upheld by this Court.
On appeal, the City argued that the subcontractor's only remedy was against Smith on his payment bond under Article 5160, even though the City did not require Smith to post such a bond. This Court noted that the purpose of the bond was to protect subcontractors, and reasoned that, although a municipality could waive the bond requirement, if it did so, it was estopped to claim that the subcontractor's only remedy for nonpayment was against a bond it did not require and knew Smith did not have. City of Ingleside, 554 S.W.2d at 945. In effect, this Court held that a subcontractor who was able to prove that the City had "stepped into the shoes of the general contractor and chose to supervise and finish the job and pay some of the laborers and subcontractors," was liable to the subcontractor on the theory of quantum meruit.
Prairie Valley Independent School District v. Sawyer, 665 S.W.2d 606, is also instructive on this matter. Like the Ingleside case, it involved a governmental authority which contracted with a general contractor, Carminati, for the construction of a public facility. The school district did not require Carminati to post a payment bond. Carminati subcontracted various aspects of the job to subcontractors and materialmen, then abandoned the project. The school district subsequently retained another general contractor to complete the building. During the interim, the subcontractors and materialmen continued to provide services and materials on the project. The trial court found that the school district entered into the supervision and control of the project and assumed the position of the general contractor.
The court in Prairie Valley stated that, if a governmental agency chooses to waive the bond requirement, then it cannot claim that the subcontractors' only remedy is against the prime contractor on the bond which it did not require. The subcontractor still must satisfy all the elements in that quantum meruit action in order to recover. This the subcontractor failed to do.
Now we consider the evidence in the cases at bar to determine whether, aside from their reliance on the City to require a valid bond, there is sufficient evidence to show that the City was put on notice that *900 Amber and Acme expected the City to pay for the services Amber and Acme performed and the materials they furnished. In considering a "no evidence" or "insufficient evidence" point of error, we will follow the well-established test set forth in Pool v. Ford Motor Co., 715 S.W.2d 629 (Tex.1986); Dyson v. Olin Corp., 692 S.W.2d 456 (Tex.1985); Glover v. Texas General Indemnity Co., 619 S.W.2d 400 (Tex.1981); Garza v. Alviar, 395 S.W.2d 821 (Tex.1965); Allied Finance Co. v. Garza, 626 S.W.2d 120 (Tex.App.Corpus Christi 1981, writ ref'd n.r.e.); and Calvert, No Evidence and Insufficient Evidence Points of Error, 38 Texas L.Rev. 361 (1960); and recite the evidence in detail where we believe that it is insufficient to support the judgment.
Harold Grimes testified for Acme, as its president. Acme's contract with La Man provided that Acme would receive monthly draws as the work was completed. Acme began work on the project in August 1983 and submitted its first draw request on September 26, 1983, for $2,761.20 plus ten percent retainage; no money was forthcoming. Acme also did not receive payment on its October and November draw requests. As of Acme's last request, it was owed $40,662.76 for equipment fixtures and labor. Acme's actual cost at the time of the lock-out was $36,717.00.
When asked whether he talked with anyone from the City about not being paid for the work, Grimes answered:
I only mentioned it to the engineer on the job there once, and I'm not sure of the date of that, whether it was ... before... the job shut down or afterwards, and he said that I didn't have anything to worry about.
Grimes said he discovered that the City had shut down the job around the first of December 1983, when Acme's workers arrived on the job site and found the gates shut. Grimes testified:
Well, at that time I had already had the last estimates (draw requests) in and I think at that time that's when I wasI believe at that time I was talking to theMr. Juan Hinojosa, I believe, about it. That's when he told me he didn't think I had anything to worry about ...
When asked if he had told a City employee that he had submitted estimates on that job, or if he had asked for information, Grimes replied:
I don't recall doing that until I found out thatat first there it was said that theyLa Man had til February 5th or 4th, somewhere, to finish before his time ran out. There wouldn't be nothing done; for me to come back and finish the project or until his time ran out.
Grimes consulted an attorney, who submitted a Notice of Claim on Acme's behalf to La Man, its surety, and the City. Acme eventually finished its work on the job under another prime contractor which the City hired to complete the project.
William Ochse, an electrical contractor and owner of Amber, testified at trial that he supervised the day-to-day operations of the company during the Meadow Park job. On July 1, 1983, he executed a subcontract with La Man for the electrical work on the project. He testified that he had previously done work for government agencies, including the City. He commenced working on the Meadow Park job, and, in late August 1983, submitted a draw request to La Man for $3,000. Forty-five days later he received $2,700 in payment (which was $3,000 less a ten percent retainage provided for in the subcontract). By the time he received payment on the first draw request, he had submitted a second draw request for $9,000. At that point he estimated his work to be approximately seventy-eight percent complete. Ochse testified he never received payment on the second draw request.
According to Ochse, the City had engineers and inspectors on the job, including a man named Hinojosa. When asked what he did when he was not paid, Ochse answered:
*901 I was getting a little concerned but I really wasn't worried at that time because I do know that when I did work for the City, and in most cases, that you will not get your moneyI had to prove up my all of my materials and supplies that was paid before the City would pay me, so according to the specifications it says that they have a performance bond and a payment bond in that plans and specifications and so I really wasn't concerned that much at that time because I assumed that they you know, that I could at least file on his bonding company but
In early December, 1983, Ochse went to the job site and found the fence locked and the job shut down. At the time of the lock-out, his total cost for material and labor which had not been paid amounted to $13,851.72.
On cross-examination, Ochse was asked whether he checked La Man's financial status before he started the job and he answered:
I had done a job at Padre Staples Mall that La Man was on and we didn't seem to have problems there, and there again, from past experience, I didn't feel like that I had a problem. Mainly because usually if you do a job for the City, my experience is I had to show invoices, paid invoices up front before they would pay me for my material and this happened to me on two occasions.
On redirect, Ochse was asked if Hinojosa ever told him about La Man's problems, and he answered:
The conversation that I can remember with Mr. Hinojosa, one time he said, well I needed to be sure to get everything, you know, all the bills and everything together. There was something wrong, but I never could figure out or find out exactly what happened at that particular time.
Ochse estimated this conversation with Hinojosa occurred approximately two weeks before the lock-out.
Eventually, Ochse consulted an attorney who sent a Notice of Claim in accordance with Article 5160 to La Man and its surety, and sent a copy of it to the City on January 13, 1984. Ochse's attorney testified that, sometime after La Man abandoned the job, but before he sent the Notice of Claim, he contacted several people in the City's engineering and legal departments and learned that the bond was "phoney" and that "we could not expect any money from anybody."
Viewing this evidence in the light most favorable to the judgment and indulging all reasonable inferences in that regard, we cannot conclude there was no evidence tending to show that such circumstances existed as to put the City on notice that these subcontractors, in rendering services and furnishing materials, were expecting payment from the City. One could infer from Ochse's testimony that his past experience on City jobs had shown that, if a subcontractor submitted paid invoices to the City, the City would reimburse the subcontractor for his materials. Further, Ochse testified in effect that, approximately two weeks before the lock-out, an agent of the City, Hinojosa, told him to be sure to get all of his "bills" together, presumably so that he could be paid by the City. As for Acme, Grimes testified that when he complained about not being paid, Hinojosa told him he "didn't have anything to worry about." Grimes also seemed to testify that a City employee told him something to the effect that he should come back and finish the project until La Man's time ran out.
The City published a pamphlet entitled "General Provisions and Requirements for Municipal Construction Contracts of the City of Corpus Christi, Texas." Hinojosa testified these provisions were in effect during the construction of this project. In fact, they formed a part of the contract between La Man and the City. Section B-7-1 of these provisions states:
If the Contractor sublets any part of the work to be done under his contract, he will not under any circumstances be relieved *902 of his responsibility and obligations... Subcontractors will be considered only in the capacity of employees and/or workmen ... The City will not recognize any subcontractor on the work.
Gerald Smith was the City Engineer at the time, and his office issued the work order and approved and authorized payments under the construction contract with La Man. He testified that the last payment the City made to La Man was on November 10, 1983, in the amount of $32,947.00 for work done the previous month. When La Man abandoned the project, it had received a total of $167,000.00 from the City, which left approximately $100,000 designated for this construction project. Smith testified that "[n]ot a penny" of that money was paid to any of the subcontractors. The prime contractor the City hired to finish the job did the work for approximately $80,000, which left $20,000 in the City treasury. The City completed the project for approximately $20,000 less than the original contract price. When asked where that money went, Smith answered, "[T]here may still be some funds in the project." When asked if these funds were available to pay the subcontractors, Smith replied, "[N]o."
Under the contract, Smith testified that the payments by the City were made to La Man and there were no provisions for payments to subcontractors. He testified that the City expects the prime contractor to hire the subcontractors. He said the usual and customary practice in the construction industry is for the general contractor to pay the subcontractors, and that the contract between the City and La Man "anticipated" that La Man would pay the subcontractors. According to Smith, the City never sets aside funds to pay subcontractors.
Considering all the evidence in the record on this issue, we can only conclude that there is insufficient evidence to support an implied finding that Amber and Acme furnished their services and labor under such circumstances as to reasonably notify the City that they expected the City to pay for the work. As such, this part of the case must be remanded for a new trial.
Ochse testified that he knew from past experience that if he produced paid invoices the City would pay him for his materials. He said this happened to him on "two occasions." The record tells us nothing more about these two prior occasions. His past course of dealing with the City on construction projects was certainly relevant here, but the record does not reflect what they were.
As for Acme, Grimes testified that Hinojosa told him that he did not have anything to worry about. Grimes also testified that someone from the City told him, "[T]here wouldn't be nothing done; for me to come back and finish the project or until his time ran out." It is unclear who made this statement to Grimes. Further, Acme did not go back and finish the job under La Man. Acme later finished the project under another prime contractor.
It is undisputed that the City knew both subcontractors were working on the job and that neither had been paid for their work. However, there is no clear, unambiguous testimony that the City encouraged them to continue working, promised to pay them, or treated them as anything but employees of La Man in accordance with the General Provisions. In fact, the City shut down the job as soon as it learned that La Man had abandoned the project. This is completely different from the situation in Prairie Valley, where the subcontractors were allowed and encouraged to continue working between the time the first prime contractor abandoned the job and the second was hired.
Further, the City never made any payments to the subcontractors and all the subcontractors' billings were made upon La Man, not the City, unlike the situation in the Ingleside case. Both Ochse and Grimes testified they read the contract and specifications for the job which stated that the City would not recognize subcontractors. Finally, the fact that the City did *903 require a payment bond tends to show a desire by the City to protect the subcontractors and to insulate itself contractually by the substitution of an alternative source of payment. See Corpus Christi Bank and Trust v. Smith, 525 S.W.2d 501, 505 (Tex.1975) (a municipality's requirement of a payment bond considered as proof that subcontractors were not intended to be third-party beneficiaries of contract between municipality and prime contractor). Considering this contrary evidence, Grimes' statement that some unspecified City employee told him to finish the job until La Man's time ran out is not sufficient evidence of the fourth element of quantum meruit to support a recovery.
The City's insufficient evidence points of error as to both Amber and Acme are sustained.

GOVERNMENT TAKING
In points of error four through eight in each case, the City argues that there was no governmental taking of the subcontractors' property for which compensation is due. Both Amber and Acme had tools and equipment on the job site at the time of the lock-out. Acme had expensive air conditioner units on the site which had not yet been completely installed. The subcontractors claim that, by locking them out of the job site and refusing to pay them for their material, the City deprived them of their property without compensation in violation of Article 1, § 17, of the Texas Constitution. This argument is certainly novel.
Tex Const. Art. I, § 17, provides in relevant part: "No person's property shall be taken ... for or applied to public use without adequate compensation being made, unless by the consent of such person. . . ." The trial court's findings of fact as to Amber in this regard are as follows:
15. [Amber] never gave permission to the [City] to take and use its materials and labor without compensation.
16. That the [City] locked out all contractors and refuses to permit them to enter upon job site or remove any materials therefrom.

* * * * * *
19. The [City] never complied with Procedures of Law or the Constitutions of the United States or Texas before the taking of property of [Amber].
The trial court made similar findings as to Acme.
We have not found any Texas authority on point. However, the general thrust of federal authority regarding government takings is that, where the governmental authority possesses property under the color of legal right, as by an express contract, there is rarely a taking under the fifth amendment. Henry Co. v. United States, 411 F.2d 1246, 1249 (Ct.C1.1969). The concept of taking as a compensable claim has limited application to the relative rights of the parties when those rights have been voluntarily created by contract. Sun Oil Co. v. United States, 572 F.2d 786, 818 (Ct.C1.1978).
This general proposition is applicable in the instant cases. Section B-7-13 of the General Provisions, which deals with suspension of work and annulment of the contract between the City and the prime contractor states, in part:
"And the Contractor hereto agrees that the City shall have the right [upon, inter alia, abandonment of the contract] to take possession of and use any of the materials, plant, tools, equipment, supplies and property of every kind provided by the Contractor for the purpose of his work and to procure other tools, equipment and materials for the completion of the same, and to charge to the account of the Contractor the expense... incidental thereto."
Clearly the City and the subcontractors had adverse contractual interests because La Man breached its contractual duties to the City and to the subcontractors. The subcontractors voluntarily brought their property onto the job site pursuant to their *904 contracts with La Man. The City had the right to shut down the job and lock out the subcontractors pursuant to its contract with La Man.
The City was not exercising its power of eminent domain, but was exercising its contractual rights. We hold that neither Amber nor Acme has a compensable claim against the City for a governmental taking.

STATUTORY DUTY
The City's points of error nine through fifteen in both cases complain that the trial court erred in rendering judgment against the City based on any tort action arising from the City's failure to secure a valid payment bond from the prime contractor. It argues that Article 5160 does not place a statutory duty on the City for which liability will lie. Specifically, the City argues in points of error eleven that it had no statutory duty other than to approve the bond as to form.
The expressed intent of the payment bond provisions of Article 5160 is to protect of "all claimants supplying labor and materials. . . ." Amber and Acme assert that the City negligently approved the fraudulent payment bond and breached its statutory duty to ensure that they would be protected under the statutory scheme.
In the instant cases, La Man submitted an executed bond form provided by the City. The surety on the bond was denominated as: "Royal Indemnity Co., a corporation organized under the laws of the State of NJ and duly authorized to do business in the State of Texas. . . ." Accompanying the bond was a power of attorney authorizing an agent of Royal Indemnity Corp. to execute bonds in the name of the "Company." This document does not reflect Royal Indemnity Corporation's address or state of incorporation, nor does it state that Royal Indemnity Company is authorized to do business in Texas. Nevertheless, the City approved the bond.
At trial, the City's Engineer testified that the first indication his office received that the bond was fraudulent was on February 14 or 20, 1984, when an F.B.I. agent in Dallas called to inquire if the City knew that A.W. Gary (a representative of Royal Indemnity) had been convicted of passing fraudulent securities and mail fraud on January 3, 1983, but had not yet been incarcerated. Smith stated that before that time he had no information that the bond might be invalid.
Smith testified that the State Board of Insurance published a "List of Authorized Insurance Companies," and that the City uses this list to determine whether a surety is authorized to do business in Texas. He stated that it was the responsibility of the City's legal department to check this list. A Royal Indemnity Company appears on the list, but it is a Delaware corporation with its home office in New York.
According to Smith, the City normally communicates with a surety through its resident agent. Smith admitted that the City never communicated with Royal Indemnity at the New York address listed on the authorized list. On December 21, 1983, Smith sent a letter to Royal Indemnity through its resident agent stating that La Man had abandoned the project and Royal Indemnity was obligated to intervene on behalf of La Man and complete the work. The City received a written response in a letter from Golden West Financial Services in Fort Worth, Texas, erroneously dated January 11, 1983. The response was written by A.W. Gary of Royal Indemnity. On January 11, 1984, Smith again wrote to La Man and Royal Indemnity and received a reply letter from A.W. Gary on January 16 stating that Royal Indemnity was in the process of choosing a replacement contractor so that they could rapidly complete the project. Smith wrote to A.W. Gary again on January 25 and February 13.
During this time, Smith testified that he spoke to the resident agent on the telephone and that Gary sent a representative, Chris Hentzen, to negotiate an agreement with the City. The last correspondence the City received from A.W. Gary was a letter *905 dated March 2 in which he inquired about the origin of rumors that the bond was "no good."
The case of Greenville Independent School District v. B & J Excavating, Inc., 694 S.W.2d 410 (Tex.App.Dallas 1985, writ ref'd n.r.e.), is the only Texas authority remotely on point. In that case, the school district awarded a prime contract for the remodeling of a school to Hudler-Tye Construction, who entered into a subcontract with B & J. No payment bond was posted. Hudler-Tye was placed into bankruptcy. B & J sued the school district for, inter alia, breach of a statutory duty imposed by Article 5160. B & J appealed the granting of a summary judgment on this point.
The majority in that case determined that the only statutory duty placed upon the contracting governmental authority by Article 5160 was simply that the bonds "shall be approved by it as to form" and only after the payment bond has been submitted by the prime contractor. Greenville, 694 S.W.2d at 414. The court held that the school district had no statutory duty to force the prime contractor to provide a payment bond such that their failure to do so would give rise to a cause of action against them by the subcontractor.
We do not completely agree with the majority. The statute clearly states that the prime contractor "shall be required... to execute" the bond. We interpret the words "shall be required" to mean that the contracting governmental authority bears a responsibility or duty to ensure that the prime contractor posts a sufficient payment bond before commencing work under the contract. However, we agree with the majority that the statute does not expressly, or even by implication, impose any liability upon the governmental authority for a breach of that responsibility or duty.
We acknowledge that the instant case differs from Greenville in that the City did not completely ignore the bond requirement. La Man did submit a payment bond, but it was fraudulent. The question in our case is not whether the City abrogated its statutory duty, but whether it performed that duty in a negligent manner.
The dissent in Greenville argues that to hold a contracting governmental authority has no duty under article 5160 to ensure that a satisfactory payment bond is posted is to frustrate the legislative intent of protecting subcontractors. It places the duty on the party who has an interest in reducing its costs by not providing that bond, or by providing an inadequate one. Greenville, 694 S.W.2d at 415 (Stephens, J., dissenting). Instead, the dissent advocates the imposition of liability against the governmental authority by implication in order to enforce the underlying intent of the legislature.
The duty of a court in interpreting a statute is to ascertain the intention of the legislature in the language of the statute itself. Jones v. Del Andersen & Associates, 539 S.W.2d 348, 350 (Tex.1976). We are not to question the wisdom of the statute, or to interpret it in a manner more just or equitable, but to apply it as written, absent constitutional infirmities.
Article 5160 expressly gives subcontractors a cause of action against the prime contractor and his surety. At common law, the State was not answerable to unpaid creditors for materials and labor expended in the construction of a public facility. See Mosher Manufacturing Co. v. Equitable Surety Co., 229 S.W. 318, 321 (Tex.Comm'n App.1921, opinion adopted). The effect of the statute, beyond the common law, is to provide for the liability of the prime contractor's surety.
Article 5160 is a remedial or curative statute designed to protect subcontractors and materialmen who provide labor and materials to public projects. It should be given a liberal construction to accomplish its expressed legislative purpose. Citadel Construction Co. v. Smith, 483 S.W.2d 283, 288 (Tex.Civ.App.Austin 1972, writ ref'd n.r.e.); see also Braugh v. Corpus *906 Christi Bank and Trust, 605 S.W.2d 691, 696 (Tex.Civ.App.Corpus Christi 1980, writ ref'd n.r.e.). To hold that Article 5160 provides for liability against the City for the breach of its statutory duty would certainly further and extend the legislative purpose of the statute. Such an interpretation would provide a meaningful incentive for contracting governmental authorities not only to require payment bonds but to consciously evaluate the adequacy of payment bonds before "approving" them. These authorities have a much better vantage point to make this evaluation than the subcontractors who are statutorily required to rely on them. Such a holding is equitably attractive. A change in this direction should be considered by the next legislature.
However, even the most liberal construction of Article 5160 could not reasonably accommodate the implication of an entirely different cause of action than expressly provided, particularly one in derogation of sovereignty. It is well established that in order for the legislature to waive the State's sovereign immunity, it must do so by clear and unambiguous language. Duhart v. State, 610 S.W.2d 740, 742 (Tex.1980); Lynch v. Port of Houston Authority, 671 S.W.2d 954, 958 (Tex.App. Houston [14th Dist.] 1984, writ ref'd n.r. e.). Absent an explicit and unequivocal grant of a right or privilege by the State, any ambiguity or obscurity in the terms of a statute must operate in favor of the State. Magnolia Petroleum Co. v. Walker, 83 S.W.2d 929, 934 (Tex.1935).
We are mindful of the harsh results of our interpretation of this statute. The results seem even harsher in the cases at bar because the City has seemed to profit at the expense of the subcontractors. It should be remembered, however, that criminal wrongdoing gave rise to the instant disputes, and civil remedies are not always sufficient to make all the wronged parties whole again.
Other state legislatures have expressly placed liability on contracting governmental authorities for breaches of their duty to require an adequate payment bond, see Annot., 64 A.L.R. 678 (1929), but ours has not. It is for our legislature, not us, to correct any deficiencies in Article 5160. Accordingly, we find that the law does not permit Amber and Acme to have a cause of action against the City for breach of a statutory duty.
The judgments of the trial court as to Amber and Acme are REVERSED and RENDERED, in part, that Acme and Amber take nothing against the City as to their governmental taking and breach of a statutory duty causes of action. The quantum meruit causes of action are REVERSED and are REMANDED to the trial court for new trial. All remaining points of error are not dispositive and are overruled. Tex.R.App.P. 90.
NOTES
[1] See City of Corpus Christi v. Smith & Sons Masonry, 736 S.W.2d 247, (Tex.App.Corpus Christi, no writ).