0625

HILTON HEAD ISLAND REALTY, INC., Respondent v. The SKULL CREEK CLUB and Resort Investment and Development Corporation, the general partner of the Skull Creek Club, a South Carolina limited partnership, Appellants.

(339 S. E. (2d) 890)

Court of Appeals

*William L. Pope* and *Robert C. Kelly,* of *Robinson, McFadden, Moore, Pope, Williams, Taylor & Brailsford,* Columbia, *for appellants.*

*G. Richardson Wieters* and *John W. Minor, Jr.,* of *Hughes & Wieters, P.A.,* Hilton Head Island, *for respondent.*

Heard Nov. 12, 1985.

Decided Jan. 29, 1986.

GOOLSBY, Judge:

This appeal arises out of a dispute concerning whether Hilton Head Island Realty, Inc., is entitled to a brokerage commission as a result of the sale of certain property on Hilton Head Island owned by The Skull Creek Club, a limited partnership, which conducted business through its general partner, Resort Investment and Development Corporation. In an action tried before a jury on theories of implied contract and unjust enrichment, Hilton Head Island Realty obtained a general verdict in the amount of $40,000. Skull Creek and Resort Investment appeal. The issues on appeal relate to the sufficiency of the evidence as to implied contract, a defense based on a South Carolina Real Estate Commission regulation, and the admissibility of certain evidence challenged as being irrelevant. We affirm.

### I. Sufficiency of Evidence

Skull Creek contends the trial court erred in refusing to grant its motions for directed verdict and judgment notwithstanding the verdict. It claims the evidence raises no reasonable inference of an implied contract between the parties requiring Skull Creek to pay Hilton Head Island Realty a commission for procuring a purchaser of Skull Creek's property. We disagree.

In ruling on motions for directed verdict and judgment notwithstanding the verdict, a trial court must view the evidence and the inferences that reasonably can be drawn therefrom in the light most favorable to the party resisting the motions and must deny the motions if either the evidence yields more than one inference or its inferences are in doubt. *Vacation Time of Hilton Head Island, Inc. v. Lighthouse Realty, Inc.,* 286 S. C. 261, 332 S. E. (2d) 781 (Ct. App. 1985). If there is any evidence to sustain the factual findings implicit in the jury's verdict, the appellate court will affirm. *Buzhardt v. Cromer,* 272 S. C. 159, 249 S. E. (2d) 898 (1978);

*Vacation Time of Hilton Head Island, Inc. v. Lighthouse Realty, Inc., supra.* We therefore examine the evidence in accordance with these principles realizing that Hilton Head Island Realty, and not Skull Creek, is entitled to all favorable inferences where the evidence is conflicting.

In May, 1981, Skull Creek purchased eleven acres of waterfront property on Hilton Head Island on which it had held options. During the next four months, Skull Creek simultaneously took steps to develop the property and entertained offers from others to purchase it.

About the time Skull Creek acquired the eleven acres, Jack Maloney, a vice-president of Resort Investment, expressed misgivings about Skull Creek developing the property to Pete Norris, a real estate agent employed by Hilton Head Island Realty. Maloney indicated to Norris that he would like him "to try to sell [the property] before [Skull Creek] actually went into the development of it."

Afterward and as a result of his conversation with Jack Maloney, Norris contacted several clients and generated some interest in the eleven-acre tract. Hilton Head Company, a subsidiary of Marathon Oil Company and the parent company of Hilton Head Island Realty, expressed interest in purchasing the property.

On June 10, 1981, Norris and David Strong, director of Hilton Head Island Realty's commercial division, attended a meeting at which Mike Mahon, consultant for Skull Creek and its assistant secretary, explained models and scale drawings of Skull Creek's plans for the development of the property.

Hilton Head Island Realty hosted a meeting three days later attended by, among others, Norris, Strong, Al Jones, president of Hilton Head Island Realty, Mike Maloney, president of Resort Investment, and William Bowen, Skull Creek's attorney. At this meeting, Mike Maloney further explained Skull Creek's plans for the eleven acres and discussed the possibility of selling it.

Sometime after the second meeting, Strong telephoned Mike Maloney in reference to the Skull Creek property. Strong advised him that Hilton Head Island Realty expected a ten percent commission from Skull Creek should either its parent company, Hilton Head Company, or any other party

it represented purchase the property. Mike Maloney responded, "[O]kay, fine."

Strong's telephone call to Mike Maloney, however, was followed on June 26, 1981, by a letter to Strong from William Smoot, Bowen's law partner. Smoot's letter, addressed to Strong at Hilton Head Company, informed him that Mike Maloney was willing to negotiate "with the Company" over the sale of the property and that the relationship "between himself and the Company remain[ed] on a principal to principal basis." The letter also advised Strong that Mike Maloney did not want the property "shopped to other potential purchasers."

Strong showed Smoot's letter to Norris. Norris in turn discussed the letter with Mahon. Mike Maloney had earlier suggested Norris discuss all matters concerning the sale of the property, other than legal matters, with Mahon because the latter, a resident of South Carolina, unlike Mike Maloney, a resident of Washington, D. C., was more accessible to Norris. Mahon told Norris to keep the information about the availability of the property "in closer confidence and [to] go ahead and deal with the people [Norris] had already made contact with." He admonished Norris, however, "to register those people."

Norris subsequently registered five clients with Skull Creek. He registered four on July 25, 1981, including Atlantic Development Corporation, and one on August 11, 1981.

Jack Maloney, in the meanwhile, provided Norris with plats, site plans, and models relating to Skull Creek's proposed development of the eleven-acre tract. Norris used these items when presenting the property to prospective purchasers.

One week after Norris first registered clients of Hilton Head Island Realty with Skull Creek, Mike Maloney wrote to Smoot and to two of his other attorneys advising them of several "prospective purchasers" of the eleven-acre tract. His letter mentioned, among others, "the Marathon Group," represented by its subsidiary Hilton Head Island Realty, and Atlantic Development Corporation.

In his letter, Mike Maloney recognized that Hilton Head Island Realty was "looking at the Property ... for both the account of its parent and that of other clients," one of them

being Atlantic Development Corporation. He stated that his only information regarding Atlantic Development Corporation came from Norris' registration letter and that he anticipated contacting Norris soon to learn more about its interest.

The client registered by Hilton Head Island Realty on August 11, 1981, Robert M. Hancock of Raintree Investments, first learned about the availability of the Skull Creek property in June from Ron Harley, another Hilton Head Island Realty agent.

Hancock made several trips to Hilton Head Island in late July and early August to view the Skull Creek property. On one of his visits, he met Norris and discussed several aspects of the property with him.

On the same day Norris registered Hancock as a client, he hand-delivered a letter from Hancock to Smoot. The letter contained an offer from Hancock to buy Skull Creek's property.

When Norris delivered Hancock's letter, Smoot remarked, "I suppose that you would certainly want a commission on the sale of the land." Norris agreed.

Smoot then asked Norris how much he thought Skull Creek should pay. Norris replied, "[T]he standard is ten percent for commercial."

Harley thereafter met with Smoot and Mahon to discuss Hancock's offer. At this meeting, they indicated to Harley that Skull Creek was not interested in paying a "substantial" commission to Hilton Head Island Realty because Skull Creek was negotiating with other prospects itself.

After some discussion, Skull Creek allowed Hilton Head Island Realty to formulate a counteroffer. The counteroffer included an amount added to the sum Skull Creek wanted for its property. The added amount represented Hilton Head Island Realty's commission.

Harley then transmitted a counteroffer to Hancock. The counteroffer embraced an added amount for a commission.

Negotiating sessions between Hancock and Skull Creek representatives soon commenced. One session, which Strong attended, involved a discussion concerning the payment of a commission to Hilton Head Island Realty. Hancock offered to pay the latter a three percent commission. At one point

during the negotiations, Skull Creek offered to pay a two percent commission.

At the closing, Hancock paid Hilton Head Island Realty a commission equal to three percent of the purchase price of property it acquired from Skull Creek. Skull Creek never paid Hilton Head Island Realty anything despite its demands for a commission.

To establish the right to recover a commission from a principal for services rendered in procuring a purchaser of property, the broker must establish that a contract for the payment of a commission existed between himself and the principal at the time the services were performed. 12 C.J.S. *Brokers* § 118 at 334-38 (1980). The contract can be either express or implied. 12 Am. Jur. (2d) *Brokers* § 158 at 896 (1964); 12 C.J.S. *Brokers* § 119 at 339 (1980). But before an implied contract can arise, the principal must either do or say something tending to prove he accepted the broker as his agent in the matter and the principal must either know or have reason to believe that the services were rendered on his behalf and to his benefit by the broker with the expectation of receiving compensation from the principal. *Hill v. Capps*, 248 Miss. 601, 611, 160 So. (2d) 186, 190 (1964); 12 Am. Jur. (2d) *Brokers*, § 159 at 897 (1964); 12 C.J.S. *Brokers*, § 119 at 342 (1980); *see* Note, *Real Estate Brokers Contracts in South Carolina*, 18 S.C.L.R. 819, 825 (1966); *cf. Hobbs v. Hudgens*, 223 S. C. 88, 74 S. E. (2d) 425 (1953) (no implied contract established where vendor not put on notice that real estate agent considered himself employed as broker).

Here, the evidence and the reasonable inferences drawn therefrom support the finding that an implied contract to pay a commission existed between the parties at the time Hilton Head Island Realty produced Hancock as a purchaser of Skull Creek's property.

The record is quite clear Skull Creek accepted Hilton Head Island Realty as its agent regarding the sale of its eleven-acre tract and knew or had reason to believe the services rendered by Hilton Head Island Realty in securing a purchaser of its property were done on Skull Creek's behalf and to its benefit and with the expectation of receiving a commission from Skull Creek.

As to evidence regarding Skull Creek's acceptance of Hilton Head Island Realty as its agent, Skull Creek's vice-president expressed to Hilton Head Island Realty's representative Skull Creek's desire to sell the property. Its vice-president furnished Hilton Head Island Realty with plats and other materials used in presenting the property. Its assistant secretary and its president met with Hilton Head Island Realty personnel to describe the property and to outline its development potential. Its assistant secretary encouraged Hilton Head Island Realty to register its clients. Its president and others connected with Skull Creek utilized information given by Hilton Head Island Realty about potential purchasers of the property, including information concerning the eventual purchaser.

As to Skull Creek's knowledge that the services provided by Hilton Head Island Realty were performed on Skull Creek's behalf and for its benefit, Skull Creek's assistant secretary, its attorney, and later its president entertained an offer to purchase the property from a registered prospect of Hilton Head Island Realty. Skull Creek's assistant secretary and its attorney authorized Hilton Head Island Realty's representative to extend a counteroffer to Hancock that included an amount added for a commission.

And as to Skull Creek's knowledge that Hilton Head Island Realty performed services for Skull Creek with the expectation of a commission, the director of Hilton Head Island Realty's commercial division put Skull Creek's president on notice it expected a commission from Skull Creek in the event it obtained a buyer for the eleven-acre tract. Skull Creek's attorney made a comment to an agent of Hilton Head Island Realty regarding its expectation of a commission for the sale of the property to Hancock. Its assistant secretary and its attorney authorized Hilton Head Island Realty to extend a counteroffer to Hancock that included an amount added for a commission after they expressed disapproval of paying a "substantial" commission. Skull Creek's assistant secretary and its attorney offered to pay a portion of the commission Hilton Head Island Realty claimed it was due on the sale of Skull Creek's property while negotiations between Skull Creek and Hancock were in progress.

We do not overlook Skull Creek's argument that, because of its letter dated June 26, 1981, no agency relationship existed between it and Hilton Head Island Realty when the latter produced Hancock as a purchaser of the property. As we noted above, the letter, described Skull Creek's relationship with Hilton Head Island Realty as being "principal to principal" and it expressed Skull Creek's desire that the property not be "shopped to other potential purchasers."

Skull Creek reads too much into its letter.

Regarding the relationship existing between the parties, the letter can be fairly read to mean that Skull Creek would not recognize the existence of any agency relationship between Skull Creek and Hilton Head Island Realty only if the latter's parent, Hilton Head Company, and not some other party, purchased the property. Skull Creek considered Hilton Head Island Realty and Hilton Head Company to be one and the same and for this reason it regarded itself as dealing "principal to principal" and not as "principal to agent" regarding any sale of its property to Hilton Head Company. But the property was not sold to Hilton Head Company. It was sold to Hancock.

As to the language in the letter expressing Skull Creek's desire that the property not be "shopped to other potential purchasers," it can be reasonably construed to mean that Skull Creek did not want Hilton Head Island Realty conducting an active search for purchasers. It did not forbid Hilton Head Island Realty either from dealing with prospective buyers with whom the realty company was already in contact or from marketing the property to prospective buyers who themselves initiated contact with Hilton Head Island Realty.

## II. Regulation

Skull Creek next contends the trial court committed error in rejecting its defense based on Regulation 105-18 of the South Carolina Real Estate Commis-

sion[1] when denying its motions for directed verdict, judgment notwithstanding the verdict, and new trial and when instructing the jury. Skull Creek argues the regulation required a written listing agreement before Hilton Head Island Realty could recover a commission on the sale of Skull Creek's property. Here, Hilton Head Island Realty had no written listing agreement with Skull Creek. The argument lacks merit.

Prior to the enactment of Regulation 105-18 in 1981, a written contract under which a real estate broker was employed to negotiate the sale of real property was not essential in South Carolina to the broker's recovery of a commission. *Carter v. McCall*, 193 S. C. 456, 8 S. E. (2d) 844 (1940).

A written contract is still unnecessary.

Only recently our Supreme Court in *United Farm Agency v. Malanuk*, 284 S. C. 382, 325 S. E. (2d) 544 (1985), held that Regulation 105-18 does not require a listing agreement to be in writing before a real estate broker can recover a commission on the sale of real property. The better practice, however, is to have a written agreement.

## III. Evidentiary Issues

Skull Creek complains about two of the trial judge's evidentiary rulings. These complaints also lack merit.

First, Skull Creek contends the trial judge committed prejudicial error by admitting, over its objection, testimony from Hilton Head Island Realty's expert witness, Paul Franks, that the custom in the real estate

---

[1] Regulation 105-18 of the South Carolina Real Estate Commission provides:

A. All listing agreements shall be in writing, properly identifying the property and containing all of the terms and conditions under which the property is to be sold including:
  (1) the price;
  (2) the commission to be paid;
  (3) the signatures of all parties concerned;
  (4) a definite expiration date.
B. It shall contain no provision requiring a party signing the listing to notify the broker of his intention to cancel the listing after such definite expiration date.
C. An "exclusive agency" listing or "exclusive right to sell" listing shall clearly indicate [in] the listing agreement that it is such an agreement and a copy shall be given to the owner at the time of the signing.

industry is for the seller of commercial property usually to pay the broker's commission.

Even if Frank's testimony were erroneously admitted, and we do not hold it was so, its admission affords no basis for reversal. The testimony was cumulative to the testimony given by Hancock. He testified, without objection, that it is an "industry standard" for the seller to pay the commission unless there is an agreement to the contrary. *See State Auto Insurance Co. v. Nationwide Insurance Co.*, _____ S. C. _____, 337 S. E. (2d) 698, (Ct. App. 1985); *Clark v. Ross*, 284 S. C. 543, 328 S. E. (2d) 91 (Ct. App. 1985).

Second, Skull Creek contends the trial judge committed prejudicial error in permitting Strong to testify about Skull Creek's offer to pay a two percent commission. They claim the offer was made during the course of negotiations to compromise a disputed claim and, as such, was clearly inadmissible against Skull Creek. *See Robertson, et al v. Blair & Co.*, 56 S. C. 96, 34 S. E. 11 (1899).

Skull Creek's own witness, Mahon, testified concerning the same offer in his lengthy response to the question asked him on direct examination, "Did you, at any time, *agree* to pay any commission for them [*sic*] to bring in a buyer to you?" [Emphasis ours.] Thus, whatever error the trial court may have committed in admitting the evidence was neutralized and cured when Skull Creek, unprompted by the prior testimony, volunteered the same evidence. *See Brazeale v. Piedmont Manufacturing Co.*, 184 S. C. 471, 483, 193 S. E. 39, 45 (1937); 5 Am. Jur. (2d) *Appeal and Error* § 806 at 248 (1962); 5A C.J.S. *Appeal and Error* § 1735b at 1032-33 (1958); *see also Alexander v. Seaboard Air Line R. Co.*, 221 S. C. 477, 484, 71 S. E. (2d) 299, 302, (1952); *Reliance Varnish Co. v. Mullins Lumber Co.*, 213 S. C. 84, 103, 48 S. E. (2d) 653, 661-62 (1948); *Hampton v. Hughes*, 85 S. C. 343, 67 S. E. 311 (1910); *cf. State v. Henderson*, 286, S. C. 466, 334 S. E. (2d) 519 (Ct. App. 1985) (admission of an improperly-obtained confession held harmless where the accused's in-court testimony contained the same damaging admissions and the

content of the accused's testimony was not dictated by the erroneously-admitted statement).

Affirmed.

SHAW, and BELL, JJ., concur.