## 1312

J. Patton WEBB, Respondent v. FIRST FEDERAL SAVINGS & LOAN ASSOCIA-
TION OF ANDERSON, Appellant.

(382 S. E. (2d) 4)

Court of Appeals

*H. Grady Kirven,* of *Watkins, Vandiver, Kirven, Gable & Gray,* Anderson, *for appellant.*

*James R. McCravy, III,* and *G. William Thomason,* both of *Callison, Dorn, Thomason & Garrett,* Greenwood, *for respondent.*

Heard Jan. 18, 1989.

Decided March 27, 1989.

GARDNER, Judge:

We are called upon in this case (1) to determine whether, considering the evidence in a light most favorable to the plaintiff Webb, there is any evidence of record to support Webb's contention that he is entitled to a real estate commission based upon the theory of either a contract implied in fact or a contract implied in law and (2) to define the elements of an action in *quantum meruit* and determine whether the preponderance of the evidence of record supports the appealed verdict on the basis of *quantum meruit.*

## TRIAL PROCEEDINGS

J. Patton Webb (Webb), a real estate broker, brought this action against First Federal Savings & Loan Association of Anderson, (First Federal) and alleged, *inter alia,* causes of action defined in the statement of case on appeal as a claim for compensation based upon *quantum meruit* and a cause of action based upon breach of an implied contract between the plaintiff and defendant for payment of real estate commissions. At trial First Federal moved unsuccessfully for a directed verdict on the basis that the evidence adduced at trial did not support a verdict on implied contract or for recovery on a *quantum meruit* basis. The jury returned a verdict in favor of Webb. Post verdict motions, also unsuccessful, for judgment n.o.v. were made on the same grounds as the motion for directed verdict. We reverse and remand.

## FACTS

Webb is a real estate broker who had helped Burger King find upstate locations for its restaurants. In 1984, Burger King asked Webb to find a new location for a Burger King franchise restaurant in Anderson. Webb found a potentially suitable lot adjacent to a First Federal branch and owned by First Federal.

Webb telephoned Charles Stuart, president of First Federal, and told him that he had been contacted by a national company which

was looking for a site in a particular location in Anderson. Webb and Stuart met on April 13, 1984, and Stuart showed Webb some other property owned by First Federal in addition to the piece of property that Webb had located. In summary, Webb and Stuart reached a tentative agreement by which First Federal would offer the property to Burger King for $155,000 of which Webb would receive $15,000 as his commission. This arrangement was confirmed by First Federal's Board of Directors. An offer to sell was submitted to Burger King but Burger King refused; there is testimony that Burger King notified Webb that it had found another site. Webb reported this to Stuart but told him that he would continue to try to persuade Burger King to use the First Federal lot. Webb wrote letters and made frequent calls in an effort to stay in touch with Burger King about the First Federal property.

In January 1985, Burger King asked Webb to again approach First Federal about its lot. Webb did contact First Federal and was told that the lot was not then available.

In July 1985, Burger King again asked Webb to ask First Federal about the lot including its availability at a higher price or by lease. Webb did this but First Federal indicated that it had decided to do nothing with the property. First Federal, however, two months later, in September, began negotiating with a Mr. Roose, of Westwind, Inc., a franchisee of Burger King. By lease dated December 23, 1985, First Master Service Corporation, a wholly owned subsidiary of First Federal, leased to Burger King's franchisee, Westwind, Inc., the subject property.

When Webb noticed the construction of a Burger King restaurant on the property, he instituted this suit.

## ISSUES

The issues of merit in this case are (1) whether there was a contract of agency between the parties either implied in law or implied in fact and (2) whether the doctrine of *quantum meruit* is applicable to this case.

## DISCUSSION

### I.

Judge Bell, of this Court, in the case of *Stanley Smith & Sons v. Limestone College*, 283 S. C. 430, 434, 322 S. E. (2d) 474, 478 n. 1 (Ct. App. 1984), succinctly defined the two types of implied contracts; we quote:

> Restitution is a remedy designed to prevent unjust enrichment. Historically the form of action for this remedy was assumpsit, although no contract, express or implied, existed between the plaintiff and the defendant. Because of this quirk of common law pleading, the term "contract implied in law" has been used to describe the circumstances under which the law imposes an obligation to make restitution for a benefit received, notwithstanding the absence of any agreement between the parties. The unfortunate use of "implied contract" to connote both true ("implied in fact") and quasi ("implied in law") contracts has led to much confusion. The distinction, however, is clear. A contract "implied in fact" arises when the assent of the parties is manifested by conduct, not words. A quasi contract, or one implied in law, is no contract at all, but an obligation created by the law in the absence of any agreement between the parties. [Citations omitted.]

An oft quoted statement relating to the difference between actual contracts or contracts in fact and quasi contracts is: "[I]n the case of actual contracts the agreement defines the duty, while in the case of quasi-contracts, the duty defines the contract." 66 Am. Jur. (2d) *Restitution and Implied Contracts* Section 2 (1973). "In quasi-contracts the obligation arises, not from the consent of the parties as in the case of contracts express or implied in fact, but from the law of natural immutable justice and equity." *Id.*

The elements of a quasi contract were set forth in the case of *Ellis v. Smith Grading and Paving, Inc.*, 294 S. C. 470, 474, 366 S. E. (2d) 12, 15 (Ct. App. 1988) thusly:

> The essential elements of a quasi-contract are: (1) a benefit conferred upon the defendant by the plaintiff; (2) realization of that benefit by the defendant; and (3) retention by defendant of the benefit under conditions that make it inequitable for him to retain it without paying its value. 66 Am. Jur. (2d) *Restitution and Implied Contracts* Section 4 (1973); *Anno.* 62 A. L. R. (3d) 288, 294 (1975). "The law will never impute a promise to pay for a benefit conferred, where it would be unjust to the party to whom it would be imputed and contrary to equity. The law never implies a promise to pay, unless duty creates the obligation to pay; and more especially, it never implies a promise to do an act contrary to duty or contrary to law." 66 Am. Jur. (2d) *Restitution and Implied Contracts* Section 2 (1973).

With this background of the applicable law, we turn again to the facts of this case. In July 1984, Burger King refused the written offer by First Federal to sell its lot for $155,000. The trial judge, during the trial of this case, ruled that thereafter there was no actual contract between Webb and First Federal. This is the law of the case and we think properly so. The first question then is whether First Federal by its conduct acknowledged a subsequent agreement with Webb so as to constitute an implied in fact contract. We find no evidence of record to support this proposition and therefore hold that there was no contract implied in fact between Webb and First Federal.

There has been much litigation about the right of a real estate broker to commissions on a sale of property after termination of his contract. The right to commissions on such a sale has been denied in the vast majority of the states of this nation, notwithstanding the fact that the broker was the procuring cause or had negotiated with the prospect prior to such termination. *See Annot.* 27 A. L. R. (2d) 1348 (1953) and the cases cited therein. The courts of this state have consistently adopted the majority view. *See Hilton Head Island v. Skull Creek Club*, 287 S. C. 530, 339 S. E. (2d) 890 (Ct. App. 1986) and cases therein cited. And it is based on a concept long recognized in this nation. In the seminal case of *Sibbald v. Bethlehem Iron Co.*, 83 N. Y. 378, 383, 38 Am. Rep. 441, 445 (1881), we find this:

> [A] broker is never entitled to commissions for unsuccessful efforts. The risk of failure is wholly his. The reward comes only with his success. That is the plain contract and contemplation of the parties. The broker may devote his time and labor, and expend his money with ever so much of devotion to the interests of his employer, and yet if he fails, if without effecting an agreement or accomplishing a bargain, he abandons the effort, or his authority is fairly and in good faith terminated, he gains no right to commissions. He loses the labor and effort which was staked upon success. And in such event it matters not that after his failure, and the termination of his agency, what he has done proves of use and benefit to the principal.
>
>     \*    \*    \*
>
> He may have introduced to each other parties who otherwise would never have met; he may have created impressions which, under later and more favorable circumstances, natu-

rally lead to and materially assist in the consummation of a sale; he may have planted the very seeds from which others reap the harvest; but all that gives him no claim. It was part of his risk that failing himself,

\* \* \*

others might be left to some extent to avail themselves of the fruit of his labors."

And our research discloses no variance from the above rule in South Carolina. *See Hilton Head Island v. Skull Creek Club, supra,* and authorities therein cited at 287 S. C. 536, 339 S. E. (2d) 891; *Hutson v. Stone,* 119 S. C. 259, 263, 112 S. E. 39, 40 (1922) ("[A] real estate broker is entitled to compensation, where a sale is effected during the continuance of the broker's agency, . . ."). It is the emphatic rule in this state that "the broker must not only show that his efforts were the procuring cause of the sale but must further show that his intervention was during the continuance of an agency to sell or to find a purchaser." *Hobbs v. Hudgens,* 223 S. C. 88, 96, 74 S. E. (2d) 425, 427-428 (1953). In this case, there is an unappealed ruling that the actual contract between Webb and First Federal ended in July 1984, when Burger King refused the offer of $155,000.

All this, in our minds, does not negate the possibility that our Supreme Court under certain circumstances might hold that a broker is entitled to his commission by reason of a contract implied in law; but at this point, we find no Supreme Court authority supporting such a thesis and, moreover, we hold that the facts of this case do not support a contract implied in law.

## II.

*Quantum Meruit* means "as much as he deserves" and it is an expression that describes the extent of the liability on a contract implied by law. *Black's Law Dictionary* 1119 (5th Ed. 1979).

The above definition relates entirely to the law of damages but the connotation of the words *"quantum meruit"* through the years has come to include a cause of action. The theory of a recovery in *quantum meruit* is that the defendant has received a benefit which would be unjust for him to retain without paying for it. *Van C. Argiras & Co. v. FMC Corp.,* 144 Ill. App. 3d 750, 494 N. E. (2d) 723, 725-726 (1986).

This state has long recognized an action for *quantum meruit* but has not defined it in detail.

From our study we conclude that the necessary elements for recovery under the action now known as *quantum meruit* are that:

> (1) valuable services or materials were furnished; (2) for the person sought to be charged; (3) these services and materials were accepted, used and enjoyed by the person sought to be charged; (4) under such circumstances as reasonably notified the person sought to be charged that the plaintiff, in performing such services, was expecting to be paid by the person sought to be charged.[1]

*City of Corpus Christi v. Acme Mechanical Contractors, Inc.*, _____ Tex. App. _____, 736 S. W. (2d) 894, 898 (1987).

Even conceding that there is evidence of record to support the first three of the above elements, we find no evidence of record to support the proposition that First Federal had notice it was expected to pay Webb for obtaining the lease with Westwind, Inc.; all evidence of record negates this contention.

## CONCLUSION

We conclude from the above discussion and authorities cited that the trial judge erred in failing to direct a verdict for First Federal or grant First Federal's motion for judgment n.o.v. because there is no evidence to support the proposition that First Federal by its conduct agreed that Webb was its agent in the lease of the property and further because there is no evidence to support the proposition that First Federal had notice it was expected to pay Webb for the lease. Accordingly, the appealed judgment is reversed and the case is remanded for entry of judgment in accordance with this decision.

Reversed and remanded.

SANDERS, C. J., and CURETON, J., concur.

---

[1] The case of *Gantt v. Morgan*, 199 S. C. 138, 18 S. E. (2d) 672 (1942), clearly implies that an expectation of payment is an element of a *quantum meruit* action in South Carolina.