THIS OPINION
 HAS NO PRECEDENTIAL VALUE.  IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN
 ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 239(d)(2), SCACR.
THE STATE OF SOUTH CAROLINA
In The Court of Appeals

 
 
 
 Retail
 Properties, Inc., Respondent,
 v.
 Horne
 Properties, Inc., Appellant.
 
 
 

Appeal From Richland County
 Alison Renee Lee, Circuit Court Judge
Unpublished Opinion No. 2009-UP-062
Heard January 6, 2009  Filed January 28,
 2009    
AFFIRMED

 
 
 
 Louis H. Lang and Ian D. McVey, of Columbia for Appellant.
 James A. Blair, III, of Greenville for Respondent.
 
 
 

PER
 CURIAM:  Horne Properties, Inc. (Horne) appeals from a jury verdict finding
 Retail Properties, Inc. (RPI) entitled to damages of $132,813 for Hornes
 breach of its contract with RPI.  We affirm.
FACTUAL/PROCEDURAL HISTORY
This matter involves an admitted contract between RPI and Horne,
 wherein RPI agreed to represent Horne as a preferred grocery-anchored shopping
 center developer in certain South Carolina counties.  RPI sued Horne after
 Horne failed to pay RPI under the contract for site acquisition services
 rendered after Horne developed a Publix at the intersection of Broad River Road and Kennerly Street in Columbia.  
RPI is a company formed by Tim Metzler that specializes in tenant
 selection. Metzler had previously worked for a company which developed large
 shopping centers, such as Wal-Mart.  When Metzler left employment with that
 company, multiple clients, including Publix Super Markets, requested Metzler
 continue to represent them.  Metzler testified these chains would engage tenant
 representation firms to explain the nuances of the market, traffic patterns,
 and demographics and come up with a strategy for possible markets.  Metzler
 stated the tenant representation role is different from a broker, who
 represents the buyer or the seller in a transaction.  A tenant representation
 firm educates the tenant on where to go; they help create a plan, they create
 the submarkets, and they find opportunities.  
Publix engaged RPI to initiate the move of Publix stores into South Carolina.  As part of this representation, Publix asked RPI to interface with fifteen
 or twenty different developers over time.  Based on longstanding relationships
 with developers, Publix may request the tenant representation firm work with
 particular developers.  In 2000, Publix requested RPI expand its areas of
 responsibility into Columbia and five counties in the Upstate.    After driving
 around Columbia, Publixs real estate manager, Bob Burkett, and Metzler
 identified five market opportunities.  At that time one of those developers,
 Horne, was soliciting business from Publix.  Based on a relationship Burkett
 had with William Hanks, a real estate manager for Horne, Burkett asked that RPI
 work with Horne when an opportunity arose.  Once Metzler, Burkett and Hanks
 identified some specific intersections of interest, the president of Horne,
 Richard Pressley, joined them in looking at the Columbia and Upstate areas. 
 According to Metzler, this business relationship ultimately resulted in RPI and
 Horne entering into a Fee Schedule agreement on March 2, 2000.  

 The agreement between RPI and Horne provided as follows:

Retail Properties, Inc. and Horne Properties
Fee Schedule

 Retail Properties, Inc. (RPI) agrees to represent Horne Properties
 as a preferred grocery-anchored shopping center developer in the following South Carolina counties:
 
 
 
 Richland  
 Anderson
 Greenville
 Pickens
 
 
 Lexington
 Cherokee
 Spartanburg
  
 
 
 
 Retail Properties assignment is to assist Publix Super Markets in
 improving their market share in the above markets.  Whenever there is an
 opportunity for a developer to be involved in a shopping center, it will be
 presented to Horne Properties.  As consideration for being a preferred shopping
 center developer, Horne Properties agrees to the following compensation
 agreement for RPI.
 Site Acquisition
 For each property purchased, a fee of $3.00 per sq. ft. on Publix
 GLA to be paid to RPI by the Seller and/or the Buyer at closing.

The document
 originally submitted by RPI to Horne contained additional services RPI could
 offer to Horne in exchange for additional fees and commissions, including
 assisting Horne with any joint ventures, Publix leases, and additional tenant
 leases.  However, these optional services were not desired by Horne and, as a
 result, the parties struck through all of these other services.  The document
 also originally provided under the site acquisition that RPI be compensated a
 fee of 5% to be paid by the Seller and/or Buyer at closing with a $75,000
 guaranteed minimum per single transaction and $100,000 guaranteed minimum per
 assemblage transaction, but this language was modified to provide for the $3
 per square foot of gross leasable area compensation, an industry standard.  Thus,
 the compensation for site acquisition work went from a percentage to a flat
 fee.  Additionally, language under the site acquisition proposal providing
 Horne would guarantee a minimum fee of 2% of the purchase price to be paid to
 RPI for the sale/purchase of shopping centers was struck through by the
 parties.    Pressleys instructions to Metzler were to go find dirt that
 Horne could own and Horne was going to develop it from the ground up.  
Working under this agreement, Metzler testified RPIs task with regard to site selection was to
 identify submarkets, further identify intersections, to help in a site
 selection process and, once everyone was in agreement on the site selection for
 a possible Publix, to go find the next site.  As site selector, RPI was to
 present all available opportunities to Horne and if the opportunities could be
 developed, assist them in the process.  Once an agreement was reached on site
 selection, Horne was responsible for continuing on the path to erect a Publix. 
 According to Metzler, RPI was to be compensated under the agreement if we
 complete a site acquisition and identify a site.  In order to complete the
 site acquisition, RPI would filter all the information, go down to the
 intersection, do the work on the submarket, and if Publix agrees to locate
 at that site, RPI would provide introductions to all the property owners. 
 Metzler testified, [O]nce the initial meetings are completed we are out of the
 picture, and on to the next site.  To achieve the final site acquisition, the
 developer would contract for the property and build a shopping center.  As a
 site selector, RPI would not be involved in the development of the property.  
In regard to the property that is the center of this dispute,
 Metzler and Burkett narrowed their search down from a submarket in the area to
 the particular intersection of Broad River and Kennerly.  At this time, RPI was
 under its agreement with Horne. The northwest corner was listed by the
 company Edens & Avant.  Metzler began to contact the owners of property on
 the northeast corner and discovered another developer, Joe Gentry, had title to
 one small parcel and held options to purchase all the other properties
 necessary for development of that corner.  At the instruction of Publix and
 Horne, Metzler approached Gentry with the opportunity to sell the property to
 Horne at a profit, but Gentry declined because he wanted to develop the
 property for Publix himself.  Publix instructed RPI to get both sides of
 property under contract so that both developers could present packages to
 Publix.  RPI then provided its full packet of information and research on the
 area to both developers.  The packages were submitted to Burkett, and he chose
 to present the northeast corner that Gentry had under contract for
 consideration by Publix.  Metzler testified that in 2000, an opportunity
 existed for Horne on the northwest corner, but there was no opportunity at that
 time for Horne as to the northeast corner that Gentry had under his control. 
 Both of the packages were ultimately rejected by Publix.  
Publix has a written rule whereby no one is allowed to resubmit a
 property site for consideration for at least one year.   In the spring of 2001,
 Philip Greenwall with Publix began traveling with Metzler in South Carolina and
 reviewed the areas looked into previously by Burkett and Metzler.  While
 looking at the northwest corner of Broad River and Kennerly that had been
 submitted again by a different developer, Greenwall indicated he liked the
 northeast corner better.  Greenwall suggested RPI get Horne involved in the
 northeast corner, so Metzler contacted Hanks and Pressley, who then instructed
 RPI to go back to the northeast corner and contact the property owners.  By
 this time, Gentry had dropped his options on the northeast corner.  Metzler
 contacted all of the property owners, who directed him to Tom Efland, one of
 the owners who was also acting as a representative for the other property
 owners.  
At the instruction of Hanks and Pressley, Metzler made arrangements
 for a meeting with Horne and Efland.    Metzler, Hanks and Pressley met with
 Efland at his office on July 11, 2001 and discussed the site, terms and
 conditions, and the possibility of putting the northeast corner under contract
 with Horne.   After the meeting, Metzler was told his work was finished on that
 job, that Horne would handle the negotiations with the property owners, and
 that RPI would be compensated. Pressley and Hanks then instructed Metzler to
 move onto another site in the Upstate.  
Approximately two months later, Horne sent RPI a termination
 letter dated September 13, 2001, stating it had come to Hornes attention RPI
 was representing other developers in the seven counties listed in the agreement
 and, because of this conflict of interest, Horne was terminating their
 agreement.  Metzler testified, while Horne was free to terminate the agreement
 at any time, RPI made full disclosure to Horne that it worked with other
 developers, sending out periodic reports which included information regarding
 RPIs work with all the developers.  Horne entered into a contract with Efland
 for his piece of property on September 25, 2001.    Ultimately, of the several
 projects on which RPI worked, Horne closed on two properties after the
 termination letter, including the northeast corner of Broad River and
 Kennerly.  While Horne paid RPI for the other project, it refused to pay on the
 Broad River and Kennerly one.  RPI presented evidence the gross leasable square
 footage of the Publix Horne subsequently developed at this location was
 44,271.  
Pressley, testifying on behalf of Horne, maintained RPIs duties
 under the agreement were to negotiate land contracts and help their personnel
 produce market data and trade area statistics, including population, household
 income, income per capita, new housing starts, current housing and schools. 
 Pressley stated Horne terminated its agreement with RPI because (1) RPI was
 working in the same market with other grocers, thereby potentially jeopardizing
 a relationship with Publix, (2) RPI had other competitive developer
 relationships, and (3) RPI failed to pursue the land contracts to the degree
 Horne had originally hoped.   Pressley testified to the various meetings and
 negotiations Horne had with the different landowners in regard to the northeast
 corner property.   He did not recall any meeting with Efland where Metzler was
 present.  Contracts were negotiated on the various properties in question for a
 period of around eight months, starting in late September 2001.   Pressley
 testified, had RPI still been representing Horne during that time, Horne would
 have expected RPI to be involved with these negotiations and execution of the
 contracts.  A Publix grocery store was subsequently constructed on the property
 and opened in November or December 2003.  Pressley testified no payments were
 made to RPI at the closing on this property because there were none due.  
When asked where in the agreement between the parties it provided
 RPI was supposed to negotiate land options with the property owners, Pressley
 stated RPI was a brokerage company, and it was inherent in the term represent
 and under the paragraph entitled Site Acquisition.   Pressley further
 admitted he struck through many of the services offered by RPI, including those
 relating to additional tenant lease, Publix lease, and joint venture
 arrangement, and that he changed the compensation under site acquisition to the
 $3 per square foot of Publix gross leasable area to be paid by the seller
 and/or buyer at closing.  When questioned on whether there was a specific list
 of tasks RPI was required to perform in order to earn a commission, Pressley
 again stated that it was inherent in that document.  Pressley admitted,
 however, that RPI had no authority to bind Horne in contracts.  
Prior to submission of the case to the jury, counsel for Horne
 submitted four requests to charge in the area of commissions, arguing the
 contract in question was in the nature of a brokerage fee agreement.  Counsel
 stated, [a]lthough there is a flat fee suggested, that flat fee depended on
 whether there was a land contract commission.   Specifically, Horne sought the
 following instructions be given to the jury:

 1.  A broker is entitled to his commissions, if during the
 continuance of his agency, he is the efficient or procuring cause of the sale.
 2.  A broker will be regarded as the procuring cause if his
 intervention is the foundation upon which the negotiations resulting in the
 sale is begun.
 3.  It is the emphatic rule in this state that the broker must not
 only show that his efforts were the procuring cause of the sale but must
 further show that his intervention was during the continuance of an agency to
 sell or to find a purchaser.
 4.  A broker is never entitled to a commission for unsuccessful
 efforts.  The risk of failure is wholly his.  The reward comes only with his
 success.  The broker may devote his time and labor, and expend his money with
 ever so much devotion to the interests of his employer, and yet if he fails, if
 without effecting an agreement or accomplishing a bargain, he abandons the
 effort, or his authority is fairly and in good faith terminated, he gains no
 right to commission.

The trial court declined to instruct the jury on these four
 charges finding, whether you call it a commission, whether you call it a fee .
 . . the bottom line is. . . whether or not [RPI] did what [it] was supposed to
 do under the terms of the contract, it was a contract for services and not
 land acquisition, and it was not a procuring cause issue and thus it was
 unnecessary to bring in procuring cause or anything along those lines.   The
 jury returned a verdict for RPI in the amount of $132,813, and Horne moved for
 a new trial based on the courts failure to give the requested instructions.   
 The trial court denied the motion, and this appeal followed.
ISSUES
1. 
 Did the trial court err in concluding the fee schedule between the parties was
 a contract for services for a flat fee because the fee schedule clearly called
 for payment of a commission if earned?
2.  Did the trial
 court err in failing to charge the jury the law as to procuring cause because
 the issue in the case was the entitlement of RPI to a commission?

STANDARD OF REVIEW
An
 action for breach of contract seeking money damages is an action at law.  Eldeco,
 Inc. v. Charleston County Sch. Dist., 372 S.C. 470, 476, 642 S.E.2d 726,
 729 (2007).  In an action at law, on appeal of a case tried by a jury, the
 jurisdiction of the appellate court extends merely to the correction of errors
 of law.  Townes Assocs., Ltd. v. City of Greenville, 266 S.C. 81, 85,
 221 S.E.2d 773, 775 (1976). 
LAW/ANALYSIS
On
 appeal, Horne asserts the trial court erred in concluding the fee schedule
 agreement was a contract for services.  It argues that RPI is a real estate
 broker that was engaged by Horne to represent it in Hornes attempt to develop
 Publix grocery stores.  Horne points to the fact that RPI often referred to its
 compensation under the agreement as a commission, and argues the $3 per square
 foot of leased space language met the definition of commission and, as such,
 RPI could only earn a commission if it was the procuring cause of the
 transaction.  Accordingly, Horne contends the trial court erred in failing to
 charge the jury on the law that in order to earn a commission, one must be the
 efficient or procuring cause of the transaction.  We disagree.
The
 trial judge is required to charge only the current and correct law of South
 Carolina, and the law to be charged to the jury is determined by the evidence adduced
 at trial.   State v. Taylor, 356 S.C. 227, 231, 589 S.E.2d 1, 3 (2003). 
 To warrant reversal for refusal to give a requested instruction, the refusal
 must have not only been erroneous, but also prejudicial.    McCourt ex rel. McCourt
 v. Abernathy, 318 S.C. 301, 306, 457 S.E.2d 603, 606 (1995).  Refusal to
 give a properly requested charge is not error if the general instructions are
 sufficiently broad to enable the jury to understand the law and the issues
 involved.  Id.     
In
 arguing its position, Horne relies heavily on the case of Webb v. First Fed.
 Sav. & Loan Assn, 300 S.C. 507, 388 S.E.2d 823, overruled in part on other grounds by Myrtle Beach Hosp., Inc. v. City of Myrtle Beach,
 341 S.C. 1, 532 S.E.2d at 868 (2000).  There, Webb, a real estate broker,
 attempted to broker a real estate deal for First Federal to sell certain
 property to Burger King for $155,000, and an agreement was reached with First
 Federal that Webb would receive a $15,000 commission.  The offer was made to
 Burger King, but Burger King declined.  Id. at 509, 388 S.E.2d at 824. 
 Sometime thereafter, Burger King asked Webb to contact First Federal about the
 lot, and when Webb did, he was told it was not available.  Approximately six
 months later, Burger King again asked Webb to approach First Federal about the
 availability of the lot.  First Federal indicated it had decided to do nothing
 with the property.  However, two months later, First Federal began negotiating
 with a franchisee of Burger King.  Three months after that, a subsidiary of
 First Federal leased the property to the franchisee, and a Burger King was
 subsequently erected there.  Id. at 509, 388 S.E.2d at 825.  When Webb
 noticed construction of the restaurant, he brought an action against First
 Federal alleging he was entitled to compensation based upon quantum meruit and
 implied contract.  Id. at 508, 509, 388 S.E.2d at 824, 825.  Reciting
 the same law Horne sought to be instructed to the jury in requests number three
 and four regarding entitlement to commissions and procuring cause, this court
 noted the unappealed ruling in the matter that the actual contract between Webb
 and First Federal had ended when Burger King refused the initial offer, and
 determined the facts of the case did not support a contract implied in law.  Id. at 512-13, 388 S.E.2d at 826.
We
 find the Webb case to be clearly distinguishable.  In the case at hand,
 RPI sought recovery for breach of the parties written contract, not under the
 theory of an implied contract.  Further, the evidence adduced at trial shows
 RPI was not acting simply as a real estate broker attempting to secure a deal
 between parties for the sale of land.  Rather, as testified to by Metzler, RPI acted as a tenant
 representative, whose role is different from a broker who represents the buyer
 or the seller in a transaction.  Metzler testified RPIs task with regard to its site selection
 duties for Horne was to identify submarkets, further identify intersections,
 help in a site selection process and, once everyone was in agreement on the
 site selection for a possible Publix, to go find the next site.  According to
 Metzler, RPI fulfilled these duties with respect to the Broad River and
 Kennerly location, and was instructed by Horne to move onto the next site. 
 Although Pressley disagreed that RPI fulfilled its duties as to this site,
 Horne presented no evidence that RPI was not engaged to perform those tasks to
 which Metzler testified, and whether Metzler fulfilled those duties under the
 contract was a question for the jury.  Under the agreement between the parties,
 Horne Properties agreed to compensate RPI for performing site acquisition on
 each property purchased, the fee being determined based on the square footage
 of the Publix thereafter erected.  While it is obvious the fee due could not be
 computed unless and until a Publix was actually erected on the location in
 question, neither this fact, nor the fact that the parties may have referred to
 the expected compensation as a commission establishes that RPI was acting
 merely as a broker, nor was there any evidence of record that RPI acted merely
 as a broker.  Further, the trial court instructed the jury on basic contract
 law, including that in order for the contract to be binding and enforceable,
 the parties must have intended to enter a contract and, through their
 negotiations, they must have reached a mutual understanding of the terms of the
 contract.  
We agree with the trial court that the evidence submitted at trial
 shows the contract between the parties was not simply one for land acquisition
 entitling RPI to only a brokerage fee, but was a contract for services, with a
 flat fee to be determined upon the successful completion of a Publix on the
 site upon which RPI performed those services.  Accordingly, we hold the trial
 court properly declined to charge the
 jury on the law relating to commissions and procuring cause as requested by
 Horne.  See Miller v. Schmid Labs., Inc., 307 S.C. 140, 142-43,
 414 S.E.2d 126, 127 (1992) (noting instruction by the trial court of irrelevant
 and inapplicable principles of law was clearly erroneous and may have served to
 confuse the jury, and holding it is reversible error to charge a correct
 principle of law as governing a case when such principle is inapplicable to the
 issues on trial).  See also Cole v. Raut, 378 S.C. 398,
 404, 663 S.E.2d 30, 33 (2008) (noting a jury charge consisting of irrelevant
 and inapplicable principles may confuse the jury and will constitute reversible
 error if the jurys confusion affects the outcome of the trial).  Further, assuming, as Horne contends, there is
 evidence that work performed by RPI fell within the definition of a real estate
 broker, the issue of the parties obligations under the contract was a question
 for the jury.  Thus, we find the general
 instructions given by the trial court were sufficiently broad to enable the
 jury to understand the law and the issues involved such that failure to give
 the requested charges was not error. 
CONCLUSION
For
 the foregoing reasons, the judgment below is
AFFIRMED. 
HUFF,
 THOMAS, and LOCKEMY, JJ., concur.